Hazel Jean GRIGSBY, Widow of John D. Grigsby, Individually and as Natural Tutrix of Her Minor Children, Javan K. Grigsby and Jennifer Ann Grigsby, Libellant,

v.

COASTAL MARINE SERVICE OF TEXAS, INC., Maryland Casualty Company, Gulf Salt Carriers, Inc., F. E. Aiple, d/b/a Aiple Towing Company, and Fidelity & Casualty Company of New York, Original Respondents, Cross-Libellants, Cross-Respondents,

WELDERS SUPPLY COMPANY OF LAKE CHARLES, LOUISIANA, Third Party Respondent, Cross-Libellant,

Olin Mathieson Chemical Corporation, Intervenor, Cross-Respondent.

No. 9949.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Nov. 4, 1964.

Baggett & Hawsey, Lake Charles, La., for libellant.

Cavanaugh, Holt, Brame & Woodley, Lake Charles, La., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Hall, Raggio & Farrar, and Plauche & Stockwell, Lake Charles, La., for original respondents.

Kaufman, Anderson, Leithead, Scott & Boudreaux, Lake Charles, La., for third-party respondents.

Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, La., for intervenor.

HUNTER, District Judge.

Mrs. Hazel Jean Grigsby, individually, and as natural tutrix of her minor children, Javan K. and Jennifer Ann, seeks damages for the death of John D. Grigsby, her husband.

Grigsby, while acting in an emergency and trying to render aid to or rescue employees of Coastal Marine Service of Texas and Welders' Supply Company of Louisiana, met his death aboard the barge Morton Salt II on November 18,

1962. The immediate cause of death was drowning and the contributing cause was asphyxiation. The original libel was filed against Gulf Salt Carriers, Inc.; Aiple Towing Company; Coastal Marine Service; Coastal's liability insurer, Maryland Casualty Company; and Fidelity and Casualty Company of New York, the liability insurer of Welders' Supply Company, Inc.

Olin Mathieson Chemical Corporation intervened in the main demand, seeking recovery of benefits it has paid and is paying plaintiff under the provisions of the Longshoremen's and Harbor Workers' Act.

As the pleadings developed, every defendant to the main demand filed cross-libels against virtually everyone in sight, including Olin.

■ The appropriate procedural device for recovery has been employed—the survivorship procedure encompassed in Article 2315 of the LSA–Civil Code.

We proceed to dispose of the main demand.

## FINDINGS OF FACT

(1) The Barge Morton Salt II is a cargo barge approximately 220 feet in length, approximately 40 feet in width, and approximately 16′ 3″ in depth, with a registered tonnage of 1,649 tons.

(2) Morton Salt II was owned by Gulf Salt but was under bare boat charter to Aiple at all times pertinent hereto. Gulf Salt had transferred to Aiple control and possession of the vessel and Aiple was the owner pro hoc vice with the legal responsibility of ownership.

(3) Morton Salt II was dispatched from Texas City, Texas via the intercoastal canal to Lake Charles, Louisiana to load a cargo of fertilizer material at Olin's plant in West Lake, Louisiana.

(4) The Barge Morton Salt II arrived and was moored in navigable waters of the United States alongside Olin's docks near West Lake, Louisiana at 12:00 Noon on Thursday, November 15, 1962. She was listing noticeably to starboard, which was being caused by an abnormal accumulation of water in her starboard tanks.

(5) Prior to the arrival of the barge, Goodrich, an employee of Aiple, contacted Mike Morgan, an employee of Coastal and advised him that the barge was being dispatched to Lake Charles.

(6) Coastal's business was that of ship repairing and related maritime work. For several years, Coastal had serviced all of Aiple's barges in Gulf Coast traffic.

(7) Mr. Mike Morgan himself, in his capacity as an employee of Coastal, proceeded to inspect the barge and found that she had at least a two-foot list to starboard. Mr. Morgan reported this to Mr. Goodrich (Aiple's agent) who instructed Morgan to sound the single tanks and to strip them or pump them out to ascertain where the leaks were. Morgan had reported leaks in the No. 1 and No. 2 starboard tanks (Tr. 944).

(8) On Sunday, November 18th, prior to proceeding to begin work on the barge, Mr. Morgan stopped by Welders' to rent a pump which was to be used in connection with Coastal's work aboard the barge. He requested from Mr. Camille Sonnier, a Welders' employee, and obtained a 1½″ Worthington Blue Brute Water Pump, and then he proceeded to the barge. With him were his son, Edward Morgan (age 17) and another employee, Gary Vige (age 18). They arrived at the docks at approximately 1:00 P.M. All three were in the employ and on the payroll of Coastal at the time.

(9) Since the barge was listing to starboard, the aforesaid Coastal employees proceeded immediately to remove the manhole cover to the No. 1 starboard wing tank in order to proceed with the pumping-out operation. They attempted to use the pump which they had obtained from Welders'. They worked with it for over a half hour but were unable to get it to draw up any water from the tank.

(10) Mike Morgan then called via telephone to Mr. Sonnier of Welders' and advised him that they were not able to get the pump to draw water, and that

they would need another pump. Sonnier advised Morgan that he would meet him at Olin's gate with an additional pump. Sonnier arrived at the Olin gate at approximately 3:45 P.M. and was met by Morgan. Together they proceeded to the Olin docks.

(11) Edward Morgan and Gary Vige then began working to get one of the pumps to pull water from the No. 1 tank. Sonnier was with them, about his employer's business of proving that the rental pump could do the work. He testified that he personally felt it was his responsibility to see that the equipment worked. After trying various methods, Sonnier proceeded down into the No. 1 tank with the suction hose and after descending into the tank and immersing the end of the hose into the water and pulling rags from the end of the hose, the pump was activated and began slowly pulling water from the tank.

(12) The three then proceeded to the No. 2 starboard wing tank. They removed the manhole cover of the No. 2 wing tank. It was tight and rusty.

(13) Sonnier asked Edward Morgan if he wanted to go into the No. 2 tank, and according to Sonnier, Morgan answered, "Well, you did it in the first one, go ahead and do it again and I will start the pump," whereupon Sonnier entered the tank, and lost consciousness as he was descending the ladder and fell, to the bottom of the tank.

(14) At the time Sonnier entered the No. 1 starboard wing tank, neither Edward Morgan nor Gary Vige made any comment as to the propriety of his action, even though Edward knew the hazards and dangers involved, and considered the procedure employed by Sonnier as unusual procedure. Further, he, Edward Morgan, knew the safety precautions recommended for safe tank entry and knew the Department of Labor regulations pertaining to safe tank entry.

(15) The Coastal employees knew the conditions and dangers that might be encountered upon opening the No. 2 starboard wing tank but made no mention of any such dangers. The bolts on the No. 2 tank were even more corroded then those on the No. 1 tank. Also, the hatch cover was sealed so tight that Gary Vige and Edward Morgan asked Sonnier to help them pry the top cover off the opening with a hammer and a screw driver.

(16) At the time or shortly thereafter all of the people on the scene had occasion to be around the opening and no odor, aroma or temperature change was noted.

(17) As Sonnier descended the ladder it was obvious to Edward Morgan that something was wrong, because Sonnier had reached a point ¾ths of the way down the ladder and then started back up the ladder, got a couple of feet from the top, and then let go of the hose "and his head fell back and his eyes shut and he just fell straight back off the ladder."

(18) Only Vige and Edward Morgan were standing by the tank opening at the time Sonnier fell off the ladder.

(19) Edward Morgan called to his father, Mike Morgan, that Sonnier needed help. Edward thought Sonnier had sustained an accidental fall and a back injury. Mike Morgan instructed Edward to try to get further help, while he, Mike Morgan, went down into the tank to help Sonnier, whose face at this time was in water.

(20) Before entering the tank Mike Morgan told Edward to "go up and call an ambulance and tell them to bring some gear down here to be able to get a man out of the hole, for I am afraid that he will have a hurt back."

(21) Mike Morgan then entered the tank, raised Buddy Sonnier out of the water, set down in the 2′ 3″ of water and leaned back against the bulwark with Buddy Sonnier cradled in his arms. After that, Mr. Morgan recalls nothing until he regained consciousness in the hospital.

(22) At approximately 4:50 P.M., pursuant to his father's instruction, Edward Morgan, who was "pretty excited" and "talking pretty loud" ran up to two

Olin employees, one of whom was George Monroe, and asked for help. He informed the Olin employees that "one of my men has fallen on the barge down here. I think his back is broken."

(23) Edward Morgan stated that one of Olin's employees asked if there was any gas or anything like that, and he, Edward, replied, "No, there is none indicated." (Tr. 82–83).

(24) Mr. Monroe, who was the shift foreman in the soda ash department, had the impression—based on what Edward Morgan told him—that men had been working in the tank and that one had fallen and hurt his back.

(25) Monroe, at Edward Morgan's request, then called for help. He called Mr. William Nelson, the fireman on duty. Grigsby (the deceased) answered one of the two extension telephones in Nelson's office, and together with Nelson was informed by Monroe that some help was needed and that a man had been hurt.

(26) Grigsby left immediately for the dock area in the plant ambulance.

(27) Grigsby was one of the first Olin employees to arrive at the scene. He arrived in the plant ambulance. The fireman, Nelson, followed in a carry-all pickup truck. Grigsby and several other Olin employees rushed up and asked Edward Morgan and Gary Vige what had happened. They were simply told by Vige that a man had fallen in the barge and they thought his back was hurt. Edward Morgan informed Grigsby, "Two guys were down in the hole and one had fallen."

(28) Grigsby and the others boarded the barge and looked into the tank and observed the heads and upper portions of the bodies of Sonnier and Mike Morgan. They appeared to be standing or sitting in the water, waiting to be removed. It appeared that one of the men was conscious and was holding the other's head up out of the water.

(29) It became obvious to the onlookers around the hole that the fire stretcher which Grigsby had brought aboard from the ambulance would not fit through the tank opening, so it was decided that they would have to use a safety harness and a rope to get the men out. Grigsby hurried from the barge to get the harness and rope and returned immediately with same and descended into the No. 2 tank to effect the rescue. Guidry stood by with the harness and rope and passed it into the tank to Grigsby.

(30) Just seconds before Grigsby entered the tank, one of the people present had observed movement inside the tank and commented that it looked like one of the men's faces was getting closer to the water.

(31) Edward Morgan and Gary Vige were still at the scene of the accident when deceased entered the tank and no warning of any type was given. In fact, it did not occur to either that there was anything dangerous about Grigsby entering the tank.

(32) Grigsby was in the tank two or three minutes before Guidry and a Mr. Maddox, who were standing by at the tank opening, discovered that Grigsby was in trouble.

(33) Upon realizing that Grigsby was in trouble, Guidry immediately descended the ladder into the tank and managed to pull Grigsby's head out of the water, but he, Guidry, then lost consciousness and fell into the water with Grigsby. By this time it became obvious to Mr. Maddox that there was gas or something else inside the tank, and that all four men were in trouble. Mr. Granger, a shift electrician at Olin, who had arrived at the scene shortly after Grigsby had entered the tank, was sent to get some gas masks. None were aboard the barge.

(34) Mr. Granger (wearing a gas mask) entered the tank and with the assistance of the personnel on the barge, started removing the men one at a time from the tank with a life line. Guidry was brought out first, Grigsby second, Sonnier third and Morgan fourth. All but Grigsby appeared to be breathing. Efforts were made to revive Grigsby by artificial respiration and by means of a nealotor, but these efforts were to no avail.

(35) It was not until after Guidry, the fourth man, entered the tank and lost consciousness, that there was any mention at the scene of gas fumes or dangerous conditions inside the tank. The whole sequence of events happened very fast. Edward Morgan said everything went by in a flash. Monroe was approached by Edward Morgan at 4:00 P.M. and everyone had been removed from the scene and Monroe was back in his office at 4:30 P.M.

(36) On the same date of the accident, Mr. Frank Simmons, a chemist at Olin, took atmospheric samples from the No. 2 tank. These samples were taken at 8:00 P.M. and 10:30 P.M. They both revealed an oxygen deficiency inside the tank. Deadly carbon monoxide was also found on four determinations to be present in proportions of 3,000, 2,000, 2,000 and 4,000 parts per million. A Shilstone Testing Laboratory chemist even found an oxygen deficiency condition in the tank more than 24 hours after the accident.

(37) The loss of consciousness by the four (Sonnier, Morgan, Grigsby and Guidry) was caused by both carbon monoxide and the lack of oxygen.

(38) John D. Grigsby never showed any sign of life after being removed from the tank. He was pronounced dead upon arrival at St. Patrick's Hospital. The diagnosis of the pathologist performing the autopsy was asphyxiation from unknown noxious gas and drowning following the fall and injury to his head.

(39) Grigsby was summoned aboard the Morton Salt in an apparent emergency at the express request of Edward Morgan, an employee of Coastal. His purpose for being aboard the barge was to render aid to and/or rescue those in the wing tank of the barge.

(40) Grigsby had a dual status aboard the barge—he was an invitee as well as a rescuer.

(41) Buddy Sonnier, an employee of Welders', was aboard the barge by invitation, either actual or implied, of Mike Morgan, a Coastal employee, and his status aboard the vessel was that of a business "invitee." He was present on the barge by virtue of a business relationship with Coastal, which was for the mutual benefit of Coastal and Welders'.

(42) The Court finds gross negligence on the part of the employees of Coastal. There can be no question but that negligence on the part of the employees of Coastal was a proximate cause of Grigsby's death. This proximate negligence consisted among other things of the following:

A. Coastal employees negligently failed to warn Sonnier, an invitee, of the danger involved in entering the barge wing tanks that had just been opened and not checked or ventilated.

B. Coastal violated Sub-Part B, Section 8.11, of the Department of Labor Regulations (29 C.F.R. 8.1 et seq.), and a well-established safety practice regarding the tank entry. The inadvertent careless acts and ordinary prudence of Edward Morgan in failing to warn Buddy Sonnier may be partially highlighted by observing that it was conclusively shown:

1. Edward Morgan knew the pertinent Department of Labor regulations and the well-established safety practices for tank entry.

2. Edward Morgan knew the reason why such regulations and safety practices existed and were necessary.

3. Edward Morgan knew that his father had instructed him never to enter a wing tank before it was tested in accordance with safety regulations.

4. Edward Morgan considered the procedure used by Buddy Sonnier in getting the pump primed, including entering the tank, an "unusual procedure."

C. Notwithstanding that both Edward Morgan and Gary Vige say they heard Sonnier mention heat and saw him lose consciousness, neither made any mention of this fact to any of the other people who later came on the scene.

Morgan and Vige simply say that it did not occur to them that there was any danger involved.

(43) The Court further finds that Buddy Sonnier was at all times pertinent hereto acting within the course and scope of his employment with Welders', and that acting in that capacity, he was guilty of negligence which was a proximate cause of Mr. Grigsby's death. The evidence is undisputed that Sonnier entered the No. 1 and No. 2 starboard wing tanks of the barge without following the safety precautions outlined in the pertinent regulations. This constituted proximate negligence. (Sub-Part B, Section 811 of the Department of Labor Regulations).

(44) In connection with the negligence of Sonnier, it should be noted that the pertinent Department of Labor regulations placed responsibility for compliance on certain employers as defined in Section 8.3(c) and 8.3(j). Within the meaning of Section 8.3j, we find that Welders' business involved "employments performed as an incident to or in conjunction with ship repair work, etc." so as to make them responsible for compliance.

(45) The Barge Morton Salt II was unseaworthy. This unseaworthiness proximately contributed to Mr. Grigsby's death. Detailing our findings in this particular, we find:

A. When the Morton Salt II arrived at the Olin docks she was listing noticeably to starboard which was being caused by the unusual and abnormal accumulation of water in the No. 2 starboard wing tank (Tr. 41, 128, 1134).

B. She was found to have 2'3" of water in the No. 2 wing tank, which is designed to provide buoyancy to the barge and therefore should contain no water whatsoever.

C. The Morton Salt II in this condition was not reasonably fit to carry the cargo of sodium nitrate which she had undertaken to transport.

D. The No. 2 starboard wing tank was oxygen deficient and contained carbon monoxide in sufficient quantities to cause those entering to lose consciousness. The hatch wings were corroded and sealed tightly. The last inspection had been on December 9, 1961.

E. The Morton Salt II, on Sunday afternoon, November 18, 1962, was unseaworthy.

F. John D. Grigsby lost his life aboard the Morton Salt II when he lost consciousness and drowned in the accumulation of water in the No. 2 starboard wing tank which had rendered the vessel unseaworthy.

G. It follows that unseaworthiness of the Morton Salt II was a proximate cause of Mr. Grigsby's death.

H. The duty of providing a seaworthy vessel was owed to Mr. Grigsby who was aboard the Morton Salt II in an emergency effort to rescue Mr. Sonnier and Mr. Morgan, both of whom were aboard doing work traditionally done by seamen.

(46) John D. Grigsby's death was caused by the joint and concurrent negligence of employees of Coastal, Welders' and the unseaworthiness of Morton Salt II.

(47) Under the total circumstances of this case, Grigsby was not guilty of negligence.

(48) There is no break in the continuity of the incidents flowing from the original acts of negligence which jeopardized Sonnier and ultimately resulted in Grigsby's death.

(49) John D. Grigsby was 25 years of age at the time of his death. He is survived by his wife, who at the time of his death was 21 years of age, and his two children, ages two years and nine months, respectively. Mr. Grigsby's annual income was $5,750. He had progressed from a mail messenger to a patrol guard; he had secured a high school diploma after he was employed at Olin; he was Chairman of the Plant Committee and Plant spokesman for his union group. The probability is that his earnings would have increased.

(50) Mrs. Grigsby is entitled to recover for the loss of love, affection, companionship and guidance sustained by her. She is also entitled to recover for the loss of future support. The determination of this type of award is not a function of the mathematical sciences. Much discretion is consequently accorded the trial court. Considering all the evidence in this case, and the awards granted in recent similar cases under Article 2315, we fix the award to Mrs. Grigsby, individually, at $40,000.

(51) The surviving children are entitled to recover for the loss of love, affection, companionship, guidance and care sustained by them. They are also entitled to recover for the loss of future support (until they reach the age of 21). Considering all the evidence in this case, and the awards granted in recent similar cases, we fix the awards to Mrs. Grigsby (as natural tutrix of the minors) as follows:

| | |
|---|---|
| Javan K. Grigsby | $24,000 |
| Jennifer Ann | $26,000 |

(52) At all times pertinent hereto, Fidelity had in effect a comprehensive general liability policy affording coverage to Welders'. Fidelity vigorously argues that its policy did not afford coverage to Welders'. We proceed to that question.

The facts in relation to coverage are these:

A. Fidelity, through the Boling Agency of Lake Charles, Louisiana, issued its comprehensive general liability policy Mo. XAP 128519 to Welders'. This policy afforded Welders' certain liability coverage as set out in said policy between the dates of May 1, 1962 and May 1, 1963.

B. This policy was in full force and effect on Sunday, November 18, 1962.

C. This policy, as it pertains to this law suit, provided coverage as follows:

"The Fidelity and Casualty Company of New York AGREES with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

"I. Coverage A—Bodily Injury Liability to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."

D. This policy, however, contained the following exclusions thereto:

"This policy does not apply: * * * (d) under coverages A and C, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract as defined herein, to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft if the accident occurs away from premises owned by, rented to or controlled by the named insured, except insofar as this part of this exclusion is stated in the declarations to be inapplicable * * *"

E. At the time of the accident involved herein, Sonnier, while in the course and scope of his employment with Welders', was engaged in work aboard the Morton Salt II, which was secured to the Olin Mathieson docks away from any premises owned by, rented to, or controlled by Welders' Supply Company.

F. It was a part of Sonnier's duty to see that equipment which his company rented was operating properly. He went aboard the barge for that purpose. He was not concerned with the pumping out of the water. (Tr. 302–305, Tr. 148).

G. This accident did not arise out of Welders' ownership of watercraft. It did not arise out of Welders' maintenance of watercraft. It did not arise out

of Welders' operation, use, loading or unloading of watercraft.

H. Accordingly, Welders' activities here are not to be considered within the meaning of the watercraft exclusion clause.

I. The cases so heavily relied upon by Fidelity are not applicable. In Upper Columbia River Towing Company, 9 Cir., 313 F.2d 702 (1963), the insured was actually loading and unloading the watercraft. In the Firemen's Fund Indemnity case, decided by the Southern District of New York in April of 1964, the insured was actually *loading* a cargo of scrap iron on a watercraft.

### CONCLUSION AS TO MAIN DEMAND

 Mrs. Hazel Grigsby, individually and for the benefit of the two minor children, is entitled to have judgment against defendants (Coastal, Maryland, Aiple and Fidelity) in the total sum of Ninety Thousand ($90,000) Dollars. As between the solidary debtors, each is liable only for his one-third portion (LSA–C.C. 2103).[1] Interest is to run from date of judicial demand.

### THE LAW AS TO UNSEAWORTHINESS

Plaintiff strenuously contends that maritime substantive law should be applied and that the State Wrongful Death statute be relegated to the role of remedy. This is precisely the view shared by the dissenters in Tungus.[2] These dissenters have noted their continued disagreement and have specifically reserved their position that Tungus should be overturned (Hess v. United States, 361 U.S. 314, 316, 80 S.Ct. 341, 4 L.Ed.2d 305). We question the present legal import of Tungus, in view of what Mr. Justice Whittaker, who was one of the majority of five in Tungus, had to say in Hess and Goett, 361 U.S. 339, 80 S.Ct. 341, and

Goett v. Union Carbide Corp., 361 U.S. 344, 80 S.Ct. 357, 4 L.Ed.2d 341. As we read him in these cases, he expresses his belief that maritime death cases are governed by "the general federal maritime law as remedially supplemented by the State's Wrongful Death Act." This brings him close to the position of the four dissenters in Tungus, but it is not our prerogative to predict whether or not Tungus will survive.

As of this moment, Tungus is the law. What was said there applies with full force here. Judge John R. Brown of the Fifth Circuit has articulately analyzed Tungus:

"As of the present moment the principle that musters a working majority can be stated briefly. The right effectively to recover for maritime death depends on a state death statute. The federal admiralty court \* \* \* may enforce these rights. What those rights are depends on the state statute or, wherever necessary, the construction put upon the state statute by the courts of that state. In this approach the state has the power to incorporate or adopt within its death statute substantive maritime law principles of negligence and unseaworthiness. If it does, then the survivors will recover, as would the decedent, on admiralty principles whether in a state court, a federal diversity civil action, or the admiralty. Otherwise, if the state confines the standard to that for non-maritime common law situations, the admiralty takes the case with all of the limitations and defenses of the right under that interpretation."

(Emerson v. Holloway Concrete Products Company, 5 Cir., 282 F.2d 271, at page 282).

 The question quickly narrows: Does the Louisiana Wrongful Death

---

1. Coastal and its insurer Maryland, for the purposes of Article 2103 of the LSA–Civil Code, are to be considered as one party.

2. The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524. Dissents: Chief Justice Warren, Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Brennan.

Statute (LSA–C.C. Art. 2315) encompass an action for death caused by unseaworthiness?

The Louisiana Statute is plain and remarkably precise. It reads in pertinent part as follows:

"Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

\* \* \* \* \* \*

"The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, \* \* \*. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased. \* \* \*"

Attorneys for Aiple insist that the Orleans Court of Appeals' decision in Babin v. Lykes Brothers, Steamship Co., 94 So. 2d 715, embodies an authoritative pronouncement clearly indicating that the doctrine of unseaworthiness is not to be encompassed into the words of Article 2315. We do not agree. The pertinent language of the Orleans Court reads:

"It should also be noted that, as already stated, this is a suit under Article 2315 of our LSA–Civil Code, and it is conceded that it is therefore controlled by the ordinary rules of negligence arising under that article of our Code. Any admiralty or maritime cause of action, including any possible charge as to the unseaworthiness of the vessel, was abated by the death of Babin. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; Graham v.

A. Lusi, Limited, 5 Cir., 206 F.2d 223."

A full reading of the Babin record and opinion will reveal that the issue of unseaworthiness was not put at issue. This is made crystal clear from a study of the briefs filed there.[3]

If presented with this problem we believe that the Supreme Court of Louisiana would hold that the failure to provide a seaworthy vessel is such a "fault" as will allow recovery under Louisiana's Wrongful Death statute.

The New Jersey,[4] Virginia,[5] West Virginia,[6] and Maryland statutes [7] have been held to incorporate the general maritime law's concept of unseaworthiness. The Louisiana statute is extremely broad; surely the result will be the same.

■■ We reiterate the words of the Louisiana Civil Code: *"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."* Concededly, the word "fault" is more inclusive and comprehensive than the word "negligence." The Louisiana Code is replete with instances. For example, Article 2317 provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, and of the things which we have in our custody." Other articles state the responsibility which man has as the owner of a building. Other articles deal with man's responsibility as a parent, as a lessor, as a lessee, as a tutor, etc., ad infinitum. The breach of a codal responsibility, if it proximately causes damages, constitutes "fault" within the meaning of 2315. Louisiana has hundreds of state and municipal ordinances, which within their scope of power establish a fixed standard by which the fact of fault may be determined. The jurisprudence

---

3. A résumé of the briefs is set forth in Mr. Harold Lamy in Vol. XI, page 221 of the Loyola Law Review (1962–63).

4. Skovgaard v. The Tungus, 252 F.2d 14 (3 C.C.A., 1959, affirmed 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524).

5. Holley v. S.S. Manfred Stonefield, 269 F.2d 317 (4 C.C.A. 1959).

6. Union Carbide v. Goett, 278 F.2d 319 (4 C.C.A., 1960).

7. State of Maryland for Use of Smith v. A/S Nabella, 176 F.Supp. 668 (D.C.Md.).

is well established that where such a statute or ordinance is enacted to protect the class of persons in which the plaintiff is included, violation of that statute or ordinance by a defendant is actionable (under 2315) if the violation is a proximate cause of damage to plaintiff. Dixie Drive It Yourself System, Inc. v. American Beverage Co., 242 La. 471, 137 So.2d 298; Moses v. Mosley, 146 So.2d 263 (La. Court of Appeals).

■ A review of the Louisiana jurisprudence convinces this Court that "fault" (under 2315) may be succinctly defined as a breach of duty or a want of that degree of care required in a given case. It is immaterial whether that duty is imposed by state statute, the common law or the maritime law. In any case the failure to perform the duty constitutes "fault."

■ Historically, there is far more justification for reaching a conclusion that the Louisiana Civil Code encompasses "unseaworthiness" than there is to conclude that various common law death statutes of fairly recent vintage encompass it:

> "Maritime law thus grew up and came of age under the tutelage of the civil law, and it still bears the imprint thus acquired, even when administered in the courts of common law countries." Gilmore & Black, Admiralty 7–8 (1957).

It would be ludicrous to say that there was no duty imposed by the maritime law not to kill persons through breach of the duty of seaworthiness. For sound reasons, the law has imposed an absolute duty on the shipowner to provide a seaworthy vessel. A breach of that duty constitutes "fault" under Article 2315.

■ Aiple insists that Grigsby had no duties even remotely of a maritime nature and could not be in a category of those persons to whom the duty of seaworthiness is owed. The answer is obvious. The duty was owed to Morgan and Sonnier. The breach of that duty was a proximate cause of the peril to Morgan and Sonnier. Grigsby, a rescuer, was favored in the eyes of the law. It would be difficult to imagine a clearer case of devotion to one's fellowman than that exhibited by Grigsby. The duty to furnish a seaworthy vessel extends to the rescuer of one imperiled by a breach of that duty to the person imperiled. Lynch v. Fisher, La.App., 34 So.2d 513; 41 So.2d 692; Am.Jur.Vol. 38 #29.

## CONCLUSIONS

■ 1. Congress has enacted legislation—notably the Jones Act and the Death on the High Seas Act—providing for wrongful death actions in a limited number of situations. No federal statute is applicable here. Grigsby was not a seaman. His death occurred upon the territorial waters of Louisiana. Plaintiff's rights depend entirely upon the Louisiana Wrongful Death Statute and the long settled doctrine that where death results from a maritime tort committed on navigable waters within a state whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel in personam for the damages sustained by those to whom such right is given. The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524.

2. The applicable Louisiana statute which gives a right of action because of death by wrongful act is Article 2315 of the LSA–Civil Code. Under that codal provision the surviving spouse in her own behalf and in behalf of the children has a right of action to recover damages sustained through the wrongful death of the deceased (LSA–C.C. Art. 2315).

■ 3. There may be more than one person guilty of "fault" and in those instances the tort feasors are liable in solido. Banks v. Associated Indemnity Corp., 161 F.2d 305 (5 C.C.A., 1947).

4. Article 2315 of the LSA–Civil Code is broad enough to encompass an action for death caused by the unseaworthiness of a vessel.

■ 5. When the owner of a vessel breaches its duty to furnish a seaworthy vessel and thereby imperils the life of one traditionally doing the work of a

seaman, it (the shipowner) owes a duty of seaworthiness to the rescuer, provided the intervention to effect the rescue is not rash or clearly imprudent.

 6. A rescuer, such as Grigsby here, is favored in the eyes of the law and one acting in an emergency to rescue the life of another from imminent peril is not chargeable with negligence merely because he failed to make the wisest choice to accomplish the purpose. 38 Am.Jur. #228; Lynch v. Fisher, 41 So. 2d 692 (La.App.1949).

 7. The proximate cause of an injury to one who voluntarily interposes to save the lives of persons imperiled by the fault of others is the fault which causes the peril. 19 A.L.R., page 13; Lynch v. Fisher, La.App., 34 So.2d 513.

 8. If one's fault is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable (Restatement Law of Torts, Sec. 435; Payne v. Georgetown Lumber Co., Ltd., 117 La. 983, 42 So. 475; Atkins v. Bush, 141 La. 180, 74 So. 897, L.R.A.1917E, 809; Lynch v. Fisher, La.App., 34 So.2d 513.

 9. Where, as here, there is a failure to comply with Safety and Health Regulations for Ship Repairing (29 C.F. R. 8.1, et seq.) by those charged with the responsibility for compliance therewith and this violation proximately results in death, there exists fault and a breach of duty which permits recovery for damages under the appropriate wrongful death statute.[8] Kernan v. American Dredging Co., 355 U.S. 423, 78 S.Ct. 394, 2 L.Ed.2d 382; Provenza v. American Export Lines, Inc., 4 Cir., 324 F.2d 660, cert. denied 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971.

### THE CROSS–LIBELS

 Louisiana law recognizes the substantive right of indemnity and where the actual fault of the damage is attributable to one of the parties and the other is only technically or constructively involved, indemnity may be had against the one primarily responsible for the act which caused the damage. Appalachian Corp. v. Brooklyn Cooperage Company, 151 La. 41, 91 So. 539; Marquette Casualty Company v. Brown, 235 La. 245, 103 So.2d 269; Travelers Insurance Company v. Busy Electric Company, 5th Cir., 294 F.2d 139. Here, each defendant denies fault in any respect. But, each filed a cross-libel pegged on the proposition that if it was at fault such fault was only technical and it would be entitled to indemnification.

 This Court has found and reiterates its findings that each defendant was guilty of active proximate negligence which resulted in Grigsby's death. It necessarily follows that each cross-libel must be denied. All counsel agree that under Louisiana law, indemnity is restricted to cases where actual fault is attributed to one party and the other party is only technically at fault. Indemnity, in Louisiana, is never applicable where both parties are actually at fault. United Gas Corp. v. Guillory, 206 F.2d 49, 5th Cir., 1953.

### WAS COASTAL CONTRACTUALLY BOUND TO INDEMNIFY WELDERS' UNDER THE CONTRACT BETWEEN THEM?

Morgan rented the pump from Welders' on Sunday, November 18, 1962. Morgan, on behalf of Coastal, signed the rental agreement which contained the following clause:

"The undersigned shall indemnify and keep harmless Welders from and against all loss or damage arising out of any injuries to or death of persons, and damage to or destruction of property, including without limitation property of the undersigned, arising from, incident to, connected with or growing out of the use and/or possession of the property by the undersigned, and the

---

8. Sub-part B–8.11 attached as Appendix A.

undersigned shall pay Welders all costs and counsel fees incurred by Welders in connection therewith."

Welders' argues that Coastal thus agreed to indemnify it in full for its liability to Mrs. Grigsby. No Louisiana case has been found containing a definitive statement of policy towards agreements purporting to indemnify an indemnitee against losses resulting from his own negligent act.

■ The broad provisions of the contract do not reveal the exact intent. The agreement certainly does not contain the talismanic words "even though caused by the negligence of the indemnitee" or like expressions. We hold it to be uncontroversial that unless the intention is unequivocally expressed, the law will consider that the parties did not undertake to indemnify one against his own negligence. Batson-Cook Company v. Industrial Steel Erectors (5th Cir.), 257 F.2d 410. This is certainly the law of Louisiana. Dubuque Fire, etc. v. Union Compress and Warehouse Company, D.C., 146 F.Supp. 482; Buford v. Sewage Board of New Orleans, La.App., 175 So. 110; Mills v. Fidelity & Casualty Co. of New York, D. C., 226 F.Supp. 786.

■ The problem is one of construction in the light of the law here enunciated. The clause of the agreement relied on is lacking in the positive directness which the law requires as essential before a court could construe it as an agreement to indemify one against the consequences of his own negligence.

Our conclusion is that the indemnity agreement involved does not require the indemnitor to save harmless the indemnitee against the consequences of his own negligence.

## ATTORNEY'S FEES BY WELDERS AGAINST FIDELITY

■ Welders' asserts a right to recover attorney's fees which it has incurred in the defense of the cross actions in these proceedings.

No Louisiana statute or decision has been called to our attention permitting such a recovery under the facts of this case. We know of none. Esteemed counsel for Fidelity have defended Welders' with vigor, diligence and intelligence. The only issue between it and its insured was coverage. On this issue, we feel they had a right to raise it, without incurring an obligation for attorney's fees. The prayer for attorney's fees is denied.

## INTERVENTION OF OLIN

■ When the crisis on the barge had been created, numerous Olin employees who had been working on jobs totally unrelated to the barge were summoned by a Coastal employee for assistance. These men hurried to the barge and saved the lives of Morgan and Sonnier. One of the Olin employees, Grigsby, met his death in the endeavor.

As a result of the employment relationship, a stipulation has been entered into that Olin has paid and is paying benefits pursuant to an award under the Longshoremen's and Harbor Workers' Act. Olin has breached no duty. *It is entitled to recover the sums so expended.*

## APPENDIX A

### Subpart B—Explosive and Dangerous Atmospheres

§ 8.11 Precautions before entering.

(a) *Gassy atmospheres.* (1) Before employees are initially permitted to enter any of the following ship's spaces either the atmosphere shall be considered to be immediately dangerous to life and the employees shall be protected in accordance with the provisions of § 8.82(a) and (b) or the atmosphere shall be tested by a competent person to ensure that it is safe.

(i) Cargo spaces or other spaces containing, or having last contained combustible or flammable liquids or gases in bulk.

(ii) Cargo spaces or other spaces containing or having last contained bulk liquid or gas cargoes of a poisonous, corrosive, or irritant nature.

(iii) Spaces immediately above or adjacent to those described in subdivisions (i) and (ii) of this subparagraph.

(iv) Spaces that have been fumigated.

(2) If the atmosphere is found to be safe, the provisions of § 8.12 shall apply.

(b) *Oxygen deficient atmospheres.* (1) Before employees are permitted to enter any spaces not covered by paragraph (a) (1) of this section, or any sealed compartments or other spaces which have been in a state of preservation, or any poorly ventilated compartments which have been freshly painted, either the atmosphere shall be considered to be immediately dangerous to life and the employees shall be protected in accordance with the provisions of § 8.82(a) and (b), or the atmosphere shall be tested with an oxygen indicator or other suitable device to ensure that it contains sufficient oxygen to sustain life.

(2) For purposes of this paragraph, an atmoshpere containing 16.5 percent oxygen or capable of supporting a flame shall be considered to contain sufficient oxygen to sustain life.

(3) Mechanical ventilation which will provide at least one complete change of uncontaminated air may be substituted in lieu of either of the requirements of subparagraph (1) of this paragraph.