Hazel Jean **GRIGSBY**, widow of John D. Grigsby, Individually and as Natural Tutrix of her Minor Children, Javan K. Grigsby and Jennifer Ann Grigsby, Appellee,

v.

**COASTAL MARINE SERVICE OF TEXAS, INC.**, Maryland Casualty Company, Gulf Salt Carriers, Inc., F. E. Aiple d/b/a Aiple Towing Company, Fidelity & Casualty Company of New York, Welders Supply Company of Lake Charles, Louisiana, Appellants.

Olin Mathieson Chemical Corporation, Intervenor-Appellee.

No. 22451.

United States Court of Appeals
Fifth Circuit.

May 1, 1969.

Rehearing Denied and Rehearing En Banc Denied June 20, 1969.

---

Charles E. Dunbar, III, New Orleans, La., Thomas C. Hall, Lake Charles, La., for Gulf Salt Carriers, Inc., and F. E. Aiple, d/b/a Aiple Towing Co.; Jas. Hy. Bruns, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Hall, Raggio & Farrar, Lake Charles, La., of counsel.

Meredith T. Holt, Donald E. Walter, Cavanaugh, Brame, Holt & Woodley, Lake Charles, La., for Coastal Marine Service of Texas, Inc., and Maryland Casualty Co., appellants-appellees.

Fred H. Sievert, Jr., Lake Charles, La., for Fidelity & Casualty Co.

William B. Baggett, Lake Charles, La., for Grigsby.

Thomas M. Bergstedt, Lake Charles, La., for Olin Mathieson Chem. Corp.

Norman F. Anderson, Kaufman, Anderson, Leithead, Scott & Boudreau, Lake Charles, La., for Welders Supply Co. of Lake Charles, Inc.

Before JOHN R. BROWN, Chief Judge, and BURGER * and WISDOM, Circuit Judges.

* Of the District of Columbia Circuit, sitting by designation.

1. Vaca v. Sipes, 1967, 386 U.S. 171, 210, 87 S.Ct. 903, 927, 17 L.Ed.2d 842, 869 (dissent).

JOHN R. BROWN, Chief Judge:

Another in that ever-growing line of multi-party 3, 4, 5, or 10-ringed amphibious Donneybrooks,[1] this one has its share of complications. At the center of the controversy is the unfortunate death of one seeking to effect a rescue aboard a seagoing barge in Louisiana. Among the questions are: Does an amphibious Good Samaritan succeed vicariously to the *Sieracki*[2] vicarious seaman's status of the ship repairer victim? If so, does the *Sieracki*-warranty of seaworthiness extend to him? Is a barge unseaworthy merely because a closed space, not fit nor meant for man, is a death chamber from its being long closed? If so, does the Louisiana Codal Lord Campbell's survival statute, permitting recovery for "fault", encompass a claim for non-negligent unseaworthiness? To what extent, and on what theory, is there an indemnity-contribution right among the parties and especially against the Employer of the decedent? To these are added other routine, customary ones concerning the sufficiency of the evidence to permit findings of duty, breach thereof, negligence, contributory negligence, amount of the award and the like.

On November 18, 1962, the decedent, John D. Grigsby, a plant guard of Olin Mathieson, sustained injuries from which he shortly died while undertaking to rescue a ship repairer (Sonnier) who was in the No. 2 starboard wing tank of the Barge MORTON SALT #2, then loading a bulk cargo at the dock in Olin's plant. The District Judge, sitting in admiralty, after a full trial and a record exceeding 1800 pages in length, for reasons set forth in its exhaustive opinion, Grigsby v. Coastal Marine Service of Texas, Inc., W.D.La., 1964, 235 F.Supp. 97, awarded recovery to the survivors against the ship repairer and others on the theory of negligence and against the

2. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698.

Barge Owner for unseaworthiness and denied indemnity against the decedent's Employer sought by all who were cast.[3]

## I.

### THE SETTING

Barge #2,[4] owned by Gulf Salt, and under charter to and operated by Aiple Towing, arrived at the West Lake, Louisiana, docks of Olin on Thursday, November 15, 1962, to take on board a cargo of 1900 tons of nitrate of soda destined to Olin at Tampa, Florida. Coastal, under its contract with Aiple Towing, was to service Aiple's barges calling at the Olin terminal, including pumping out and other work preparatory to taking on cargo. On November 16, the day after arrival, Mike Morgan advised Aiple Towing that Barge #2 was clean and ready for loading, but that it was listing to starboard. Goodrich from New Orleans then instructed Mike Morgan to sound the wing tanks and if any water was found in the tanks, to "strip them out."

Coastal's business was that of ship repairing and related maritime work. For several years, Coastal serviced all of Aiple Towing's barges in the area. Morgan's inspection of the barge on November 15, 1962, revealed that she had at least a two foot list to starboard. He did not gauge or open the No. 2 starboard wing tank but gauged the No. 1 tank and found 2' 8" of water. He reported leaks in the No. 1 and No. 2 starboard wing tanks to Aiple Towing and was instructed to perform the necessary repairs to make the barge seaworthy. This would require that the wing tanks

3. As we refer to them, these are the parties (including the respective Louisiana Direct Action Insurers):

| | |
|---|---|
| Grigsby | John D. Grigsby |
| Coastal | Coastal Marine Service, of Texas, Inc. (Maryland Casualty Company) |
| Welders | Welders Supply Company of Lake Charles, Inc. (Fidelity & Casualty Co. of New York) |
| Barge #2 | MORTON SALT #2 |
| Gulf Salt | Gulf Salt Carriers, Inc. (Owner of Barge #2) |
| Aiple Towing | F. E. Aiple, d/b/a Aiple Towing Co. (Bareboat Charterer Barge #2) (Owner *pro hac vice*). The collective term Shipowner refers to both Gulf Salt and Aiple Towing unless otherwise stated. |
| Olin | Olin Mathieson Chemical Corporation |

The human actors are:

| | *Full Name* | *Employed by (Job)* |
|---|---|---|
| Morgan | Mitchell A. (Mike) Morgan | Coastal |
| Edward | Edward Morgan (Age 17, son of Mike) | Coastal |
| Sonnier | Camille P. Sonnier | Welders (Mechanic trainee-salesman) |
| Vige | Gary Vige (Age 18) | Coastal |
| Monroe | George W. Monroe | Olin (shift foreman) |
| Nelson | W. A. Nelson | Olin (fireman) |
| Guidry | C. J. Guidry | Olin (conveyor operator) |
| Maddox | Wilburn E. Maddox | Olin (process foreman) |
| Granger | James L. Granger | Olin (shift electrician) |
| Goodrich | Ray E. Goodrich | Aiple Towing (in New Orleans) |

4. She is a sea-going barge 220' in length, 40' in beam, depth 16', gross tonnage 1649. Dimensions of each wing tank are:

Length: 40'
Width: 5'
Depth: 16'3"

be pumped out and then inspected to determine the nature of the leaks.

After the inspection of November 15th, Morgan decided to wait until the weekend to pump out the wing tanks to avoid interfering with the loading operations. The loading of the barge did not require any Olin employees to work aboard the barge. No one from Olin had reason to inspect the No. 1 and No. 2 wing tanks.

On Sunday, November 18, 1962, prior to returning to the barge, Morgan rented a 1½" pump from Welders.

Morgan, his young son, Edward and Gary Vige, entered Olin's plant at 1:05 P.M. Both Edward and Gary Vige were in the employ and on the payroll of Coastal at the time. Edward, although young, was considered an experienced marine worker by his father. On the other hand, Gary Vige had only worked for Coastal on three or four jobs of short duration. Edward knew that Gary Vige had never helped pump out a barge.

All three went aboard the barge with the rented pump. They knew the No. 1 starboard wing tank had water in it. In order to place a hose in the tank, however, it was necessary that the hatch cover be removed. The hatch cover at the No. 1 wing tank was badly corroded and sealed tightly to the deck. In addition, when the vent plugs were removed on both the No. 1 and No. 2 wing tanks, they either "blew" or "sucked". To Edward this indicated that the wing tank had been sealed for some time.

Efforts to get the pump started at the No. 1 tank continued for about one hour because of difficulty in getting the pump to pick up suction. After working unsuccessfully for approximately an hour to get the pump started, Morgan left the barge and called Sonnier requesting that Sonnier come out and check the pump or bring another pump. Sonnier agreed to bring another pump. At 3:45 P.M. Sonnier arrived with two additional 1½" pumps. Sonnier, representing Welders, went aboard the barge

with the Coastal employees and worked to start the pump at the No. 1 wing tank. Morgan went onto the dock at about 4:00 P.M. During the next 40 minute period, Sonnier, with Edward and Vige, tried to get the pump started. Morgan was on the dock approximately twenty feet away, connecting a water hose to provide a direct prime to the pump. After several attempts to get the pump to pick up suction, Sonnier, assisted by Edward and Vige, finally decided to fill the hose with water and plug the end of the hose with a rag. Sonnier then descended the ladder into the No. 1 wing tank. As Edward and Vige started the pump, Sonnier placed the hose in the water and removed the plug. He then came out of the No. 1 wing tank. The Welder's hose had no foot value to hold the prime until the pump picked up suction. In addition, the 1½" pump being used was designed to have a maximum lift of 10 to 12 feet.

At the time Sonnier entered the No. 1 wing tank, he knew nothing of a danger involved. He assumed the employees of Coastal had been in the tank. Up to this time, Morgan was not present on the barge.

At the time Sonnier entered the No. 1 tank, neither Edward nor Vige made any comment as to the propriety of his action although Edward knew the hazards and dangers involved and considered Sonnier's procedure to be unusual. He knew the safety precautions recommended for safe tank entry and the Department of Labor Regulations pertaining to safe tank entry. Vige, on the other hand, had no such knowledge nor had he ever received instruction.

After the pump was in operation at the No. 1 tank, Morgan was so informed and even though they had been trying to get the pump to pick up suction for over an hour and a half, he didn't ask how they got it started. The discharge of water from the No. 1 tank was so slow, however, that Morgan decided to use the additional pump brought by Sonnier at the No. 2 starboard wing tank. It was getting late and Morgan was in a hurry

to get the job done and go home. After he informed the others of the decision to use the other pump, Vige and Edward then proceeded to remove the manhole cover from the No. 2 wing tank. While the No. 2 wing tank was being opened for the first time, Sonnier went on the dock. Morgan knew the conditions and dangers that might be encountered upon opening the No. 2 starboard wing tank. But although he knew nothing of Sonnier's experience, he made no mention of any dangers, apparently assuming that Sonnier would not enter the tank.

The bolts or nuts on the No. 2 tank were even more corroded than those on the No. 1 tank. Also, the hatch cover was sealed so tightly to the deck that Vige and Edward had to get Sonnier to help them pry the top cover off with a hammer and screw driver. It was perhaps as much as twelve months since this sealed, unventilated wing tank had been opened. At the time the No. 2 wing tank cover was removed, no odor, aroma or temperature change was noted. There was no indication or mention of any danger involved.

Within five to ten minutes after the hatch cover was removed and the pump in place Sonnier asked Edward if he wanted to take the hose down into the tank and pull the plug out. To this Edward replied: "Well, you did it in the first one, go ahead and do it again and I will start the pump." Thereupon Sonnier entered the No. 2 starboard wing tank. Again, no warning or statement of any type was given by the Coastal employees. Sonnier was aware of no danger in entering the wing tank.

As Sonnier descended the ladder into the No. 2 wing tank, it was obvious to Edward that something was wrong because Sonnier got three-fourths of the way down the ladder and then started back up. Edward saw that as Sonnier got a couple of feet from the top, he let go of the hose, "and his head fell back and his eyes shut and he just fell straight back off the ladder." Only Vige and Edward were standing by the tank opening at that time. Edward

knew that Sonnier had lost consciousness. Edward immediately called his father and informed him that Sonnier had fallen but did not mention any loss of consciousness by Sonnier. His father told Edward: "Go up and call an ambulance and tell them to bring some gear down here to be able to get a man out of the hole, for I am afraid that he will have a hurt back." Morgan, then, without stopping to consider whether it was safe or not, posted Vige by the hatch opening and immediately entered the tank and raised Sonnier into his arms, sat down in the 2′ 3″ of water, and leaned back with Sonnier cradled in his arms. After that, Morgan recalls nothing until he regained consciousness in the hospital some hours later. At the time Morgan entered the tank, there was no indication of any fumes, lack of oxygen, or temperature change.

Following his father's instructions, Edward, who was "pretty excited", ran up to two Olin employees one of whom was Monroe, the shift foreman, and asked for help. He informed them that "one of my men has fallen on the barge down there. I think his back is broken." One of Olin's men asked him if there was any gas or anything and Edward replied: "No, there is none indicated." Monroe immediately called the fireman on duty, Nelson.

It is at this point that decedent Grigsby enters the picture. He was a patrol guard and was on duty in Nelson's office. Grigsby answered one of the two extension phones and, together with Nelson, was informed that some help was needed at the dock, that a man had been hurt. Grigsby left immediately in the plant ambulance for the dock area. The firemen, not the patrol guard or ambulance driver, were responsible for first aid. There was no such thing as a rescue squad or team at Olin.

Grigsby was one of the first Olin employees to arrive at the scene. The fireman, Nelson, followed shortly in a carryall pick-up. Grigsby asked Edward and Vige what had happened. Vige stated that a man had fallen in the barge and

they thought his back was hurt. Edward, in response to Grigsby's inquiry, informed him: "Two guys were down in the hold and one had fallen." The impression created was that there was a man in the tank with an injured back.

Immediately thereafter, Grisby, Monroe, Maddox and Nelson, all Olin employees, boarded the barge and looked into the tank. They could see the heads and upper portions of the bodies of two men. They appeared to be standing or sitting in the water. One of the men appeared to be conscious and was holding the other's head out of the water. It was obvious that the wire stretcher Grigsby had brought aboard would not fit through the tank opening, so it was decided that to get the men out they would have to use a safety harness and rope. Grigsby returned shortly thereafter with the harness and rope, and leaving them on the barge, immediately descended into the No. 2 tank. Guidry was standing nearby with the harness, which he passed into the tank to Grigsby. Maddox was primarily concerned with moving the man who had an injured back, however, just seconds before Grigsby entered the tank, Maddox had observed movement inside the tank and commented that it looked like one of the men's faces was getting closer to the water. Monroe was not then at the scene as he had gone to call for another ambulance. Monroe knew that Olin men were going to try to use a rope and harness to get the other men out and there was no indication of any danger involved.

Edward and Vige were still at the scene when Grigsby entered the tank, and no warning of any kind was given. The impression was still that employees of Coastal and Welders had been working in the barge tank and one had fallen and hurt or broken his back. And that is what Grigsby thought for he told Guidry that there was a man in the barge with a broken back. Grigsby said nothing after entering the tank. On reaching bottom he slipped or lost consciousness and fell face down in the water.

Grigsby was in the tank two or three minutes before Maddox and Guidry, who were standing near by, discovered he was in trouble.

Upon seeing that Grigsby was in trouble, Guidry immediately descended the ladder into the tank and pulled Grigsby's head out of the water. Guidry then lost consciousness and fell back into the water with Grigsby. It then became obvious to Maddox that there was gas or something inside the tank and that all four men were in trouble. Granger, a shift electrician at Olin, was sent to get some gas masks. Nelson, on the other end of the dock, learned of the situation by walkie-talkie. After putting a Scott Air Pack and life line on, Granger went into the tank. Within six or seven minutes after Guidry's entry into the tank, Granger entered and with the assistance of the personnel on the barge, removed the men one at a time from the tank with a life line. Guidry came out first, Grigsby second, Sonnier third, and Morgan fourth. All but Grigsby appeared to be breathing. Efforts to revive Grigsby by artificial respiration and use of a neolator were unavailing.

The first mention of gas, fumes, or dangerous conditions inside the tank came after Guidry, the fourth man, entered the tank and lost consciousness. Of course things happened very fast. According to Monroe he was approached by Edward at about 4:50 P.M. and everyone had been removed from the scene and he was back in his office by 5:30 P.M. Two others estimated that 15 to 20 minutes passed between the call for help and the time all men were sent to the hospital and another put it at less than 15 minutes.

Later that night, at 8:00 P.M. and again at 10:30 P.M. Simmons, a chemist at Olin, took atmospheric samples from the No. 2 starboard wing tank. These revealed an oxygen deficiency inside the tank, the 8:00 P.M. samples showing oxygen at 11.0%, 11.0%, and 10.9%, and the 10:30 P.M. samples showing oxygen at 11.6%. On four determina-

tions deadly carbon monoxide was also found to be present in proportions of 3000, 2000, 2000, and 4000 parts per million. An independent laboratory chemist even found an oxygen deficiency condition in the tank over 24 hours after the accident. With normal air having 21% oxygen, an atmosphere is immediately dangerous to life if the oxygen is less than 16.5%. The presence of 3000 p.p.m. of carbon monoxide can cause headaches and dizziness in five to ten minutes. Simmons was of the opinion that the carbon monoxide caused the men who entered the No. 2 wing tank to pass out.

It ends the narrative of this industrial tragedy to state that Grigsby never showed any sign of life after being removed from the tank. He was pronounced dead upon arrival at St. Patrick's Hospital. The diagnosis of the pathologist and autopsy prosector was asphyxiation from unknown noxious gas and drowning following fall and injury to the head.

## II.

### WHOSE LAW?

Of this evidence the admiralty Judge found the Barge #2 unseaworthy (its owner free of negligence), Coastal and Welders guilty of negligence proximately causing Grigsby's death, and Grigsby free of contributory negligence. He exonerated Olin of any liability. Judgment issued for the survivors of Grigsby against Coastal, Aiple Towing, and Welders (or their Direct Action Liability Insurers), fixing damages at $90,000 and dismissing all cross claims and claims for indemnity.

All appeal except Olin.

Before discussing the several attacks, two comments seem appropriate.

The first is that as so often, the briefs on the part of the respondent-appellants "cannot resist the natural temptation to reargue the facts from a point of view favorable to [each of them], although now adversely determined by the trial Judge." Myles v. Quinn Menhaden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, 148, 1962 A.M.C. 1626, 1628. Counsel, experienced and able as they are, trying valiantly to formulate it in the mold of "clearly erroneous" "now incrusted on the hull of maritime jurisprudence," Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 694, 1962 A.M.C. 1710, 1712,[5] simply refuse to recognize, even at this late date, "that in this kind of controversy [the] functions of the courts in the judicial hierarchy are distinct and different" and we would "undermine the vitality of the system by a too-quick meddling in the principal business of a trial court. * * * A trial of a hotly contested, sharply disputed case is the task of a trial court" and reviewing courts "even in admiralty * * * should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous, running advocacy." Ohio Barge Line v. Oil Transport Co., 5 Cir., 1960, 280 F.2d 448, 449, 1961 A.M.C. 375. Indeed, we must constantly remind ourselves of our distinctive roles. "If we were to approach it as simply a question—how should this case be decided?—we would effectually bypass a trial court. The problem faced is more nearly that of determining whether the trial judge, faced with the choice—often hard choices between competing versions of simple or complex occurrences—has fairly weighed the matter and has reached a conclusion which seems substantial and reasonable even though another result might have been achieved either by him or others." 280 F.2d at 448–449.

5. And now formalized by the integrated rules, F.R.Civ.P. 9(h). See 39 F.R.D. 69, 75 (1966); 39 F.R.D. 146 Supp.Rules (1966). See also Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 27 n. 4. Stern, Hays & Lang, Inc. v. M/V Nili, 5 Cir., 1969, 407 F.2d 549, 550 n. 6.

The second, perhaps even more surprising, is that except for the discussion on the claim of seaworthiness of the Barge as such and Part V on the meaning of "Fault", all of these counsel have seemingly been quite indifferent to the controlling significance of maritime, rather than local Louisiana law. This is so whether the injured party has the *Sieracki* status of a seaman, Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, 1954 A.M.C. 1, or that of a party having a rightful presence aboard a vessel, Kermarec v. Compagnie Generale Transatlantique, 1958, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597. And this is altered only slightly by the requirement that there be the local, Louisiana, survival statute.[6]

### III.

### THE AMPHIBIOUS GOOD SAMARITAN

Because its implications run throughout this case, it is helpful to discuss the Good Samaritan doctrine and its availability and applicability here. Of course it has two facets—duties owed to one who, without legal obligation, voluntarily undertakes to rescue another, on the one hand, and, on the other, duties owed by such volunteer either to the one being saved or to others.

Certainly as to this element, the views of the parties are way too narrow in debating, as the briefs do, the specific question whether the Louisiana doctrine of Lynch v. Fisher, La.Ct.App., 1949, 41 So.2d 692, is applicable. Not that we find any fault with that case reflecting,

as it does, for Louisiana, the humanitarian desire to encourage emergency rescues. Rather, a broader approach comes from the basic notion mentioned above that this is an admiralty case controlled by substantive principles of maritime law.

Of course that statement itself puts an end to any problem. For of all branches of jurisprudence, the admiralty must be the one most hospitable to the impulses of man and law to save life and limb and property. The law of salvage, a distinctively maritime branch of the law, is the historical forerunner of latter day doctrines which supposedly reflect the more enlightened and humane outlook of contemporary society. Maritime law in every way and in every context encourages the salvor to salve— to save. Indeed, for saving property it offers an effective flexible, enforceable reward. And to eliminate a deterrent to voluntary, impulsive response to need as the forces of nature or man, or both, imperil ship or seamen, the law accords a considerable latitude in the standard of performance of the salvage service. The salvor is seldom held liable for just a failure to save and liability for negligent salvage is limited to situations in which the salvor, through want of due care, has worsened the position of the victim.[7]

In matching law to man's needs, moral and physical, the admiralty would be the first to accord great liberality to this doctrine. Indeed, as the admiralty looks at it, the greater the risk, the greater the seafaring man's obligation to respond, and the greater the risk, the greater is the reward where awards can

6. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, 1959 A.M.C. 813; Goett v. Union Carbide Corp., 1960, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341, 1960 A.M.C. 550; Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305, 1960 A.M.C. 527; see Emerson v. Holloway Concrete Prod. Co., 5 Cir., 1960, 282 F.2d 271, 281–282, n. 11, 1961 A.M.C. 1484, 1494 n. 11 (dissenting opinion); Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 1960, 276 F.2d 42, n. 6, 1961 A.M.C. 1469, 1474

n. 6; Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 64, 1961 A.M.C. 1651, 1655.

7. United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, 1961 A.M.C. 1439; Oil Screw Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 1961 A.M.C. 1641, 5 Cir., 1963, 322 F.2d 3; United States v. Lawter, 5 Cir., 1955, 219 F.2d 559; Norris, Salvage §§ 120, 278 (1958). See also Carver v. Liberty Mutual Ins. Co., 5 Cir., 1960, 277 F.2d 105, 108 n. 4.

be made.[8] Whatever restrictions there might be on the admiralty concept of salvage as to the significance of any supposed duty on the part of Grigsby to rescue a fellow employee of Olin, there can be none at all with regard to third persons in the employ of others and rightfully aboard the vessel at the time of rescue. If—and the if seems to be a very, very big one on this record—Grigsby, simply because he drove an ambulance and worked in the plant protection department is somehow thought to have the duty of a safety inspector who is to render first aid—this can have absolutely no bearing upon his status as a maritime life salvor. Neither he nor his employer owed a legal duty as such to rescue employees of Coastal, Welders, or both. His impulsive action in the best tradition of the sea gave him this highly preferred status. Since in doing these humane acts, he was doing that which a seaman responding to the call of the sea would have done, he was, in a very real sense and in the *Sieracki*-sense, doing the work of a seaman. He can accordingly claim the rights of a vicarious seaman including that of the warranty of seaworthiness.[9]

■ Once this status is clearly recognized, it is almost captious to suggest that his conduct was so lacking in prudence as to forfeit the status or the benefit of its protection. Of course he forgot—if he ever knew—as had Sonnier and Morgan and Guidry, that a steel compartment long-closed and sealed from

anoxemia can be a death trap due to an oxygen deficiency. But there was no proof which compelled a finding that he did know and there is much to the contrary. More so, the evidence shows the mistaken but good faith universal belief of all those nearby that the injury was a damaged or broken back from a fall, not asphyxiation, partial or complete. Neither by finding nor proof do any of the challengers bring Grigsby's conduct within the land-based principles invoked.[10]

### IV.

### GRIGSBY'S CONTRIBUTORY NEGLIGENCE

■ It is almost impossible to separate an analysis of this contention from Gribsby's status as a salvor. Assessment of his conduct as an ordinarily prudent person under those circumstances brings into direct play the problem of the emergency which apparently faced all. One man was thought to be seriously injured by a broken or badly injured back. A second man (Morgan) had gone in after him, but Morgan's position holding Sonnier above the water and the current reports being repeated by all hands that the first had sustained an injury to his back did not charge Grigsby with knowledge that the tank was a death trap from the risk of asphyxiation. Of course, its true that Grigsby was a plant guard, perhaps had some safety duties for which he had received training in the use of instruments such as a neolator, the Scott Air Pack, shoulder har-

8. Mississippi Valley Barge Line Co. v. Indian Towing Co., 5 Cir., 1956, 232 F.2d 750, 755:
 "Salvage at sea may and often does call for the performance of exciting acts of great bravery to rescue lives or property from the jaws of a near and certain doom. But it need not, for the aim of salvage is to save. To aid before it is a do-or-die wager with high risks, high stakes, and high rewards, assures the greatest likelihood of recovery at the least peril. Maritime salvage is not reserved for hero alone. Its generous but judicious liberality is to encourage mariners instinctively to respond to need—be it great or small,

 drab or spectacular, certain in the knowledge that the scale of The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, provides the means to find a balance."

9. Jackson v. Lykes Bros. S.S. Co., 1967, 386 U.S. 731, 733–734, n. 4, 87 S.Ct. 1419, 1421, n. 4, 18 L.Ed.2d 488, 490–491, n. 4, 1967 A.M.C. 584, 586–587, n. 4.

10. One or more press heavily. Prosser, Torts § 49, at 361 (1941); 2 Harper & James, Torts § 21.1, at 1167 (1956); Matthew Bender & Co., Personal Injury, Actions, Defenses and Damages, Vol. 5, "Rescuers," §§ 1.03, 1.04; Restatement, Torts § 472, at 1241 (1934).

ness and life lines and was, at least on this occasion, an ambulance driver. But despite this, the record does not show, and indeed certainly does not compel a finding, that the moment before entering the tank Grigsby was aware that the lives of all were imperiled by the presence of noxious gases or the absence of sufficient life-sustaining oxygen.

Indeed, it is at some of these points, that the claims of the challengers become spectacularly contradictory. For example, one brief urging rejection of the Good Samaritan doctrine states: "Obviously, the danger was not imminent, nor was there reasonable appearance of imminent danger since several people had viewed the scene and felt no compulsion to enter immediately. Both of the men, Sonnier and Morgan, were above the water and resting comfortably. * * * [This is] best evidenced by the fact that they came out, some 30 minutes after first going into the hold, alive and well." [11] Within fewer than four printed pages, the same advocate in the same brief contradicts this.[12]

This attack of contributory negligence fails.

## V.**

## DOES "FAULT" INCLUDE NON-NEGLIGENT UNSEAWORTHI-NESS?

The shipowner contends that even though the barge was unseaworthy the decree against it cannot be sustained since there is no finding of negligence as to it, and non-negligent unseaworthiness gives rise to no right of action under Article 2315 of the Louisiana Civil Code. The question requires this Court to divine what Louisiana courts would say: under the *Tungus-Hess-Goett* synthesis,[13] substantive rights for death caused by unseaworthiness are fixed by state law.[14]

---

11. Brief for Coastal at 22.

12. When it came time to assert the claim that Grigsby was contributorily negligent as a matter of law, they reverse course and breath once hot now become noticeably cold.

 "(12) Grigsby could see Sonnier and Morgan in the wing tank and could see that neither of them were moving; therefore he should have become increasingly aware of the possibility of gas." Brief for Coastal at 26.

** Judge Wisdom authored Part V for the Court.

13. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, 1959 A.M.C. 813; Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed. 2d 305, 1960 A.M.C. 527; Goett v. Union Carbide Corp., 1960, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 on remand, Union Carbide Corp. v. Goett, 4 Cir. 1960, 278 F.2d 319, 1960, A.M.C. 1119, cert. denied, 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed. 2d 55.

 "The sea of jurisprudence is hardly calm or placid on this point. There are undulating currents. Scarcely within a year of its pronouncement in Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 523, 3 L.Ed.2d 524, 1959 A. M.C. 813, two Justices making up the *Tungus* majority now insist the Con-stitution puts a ceiling on state death actions. Another Justice restricts, if not retracts, his prior concurrence in *Tungus* by recognizing state death acts only 'as remedially supplemented.' The former dissenting minority join the two remaining Justices to make up a new majority 'but solely under the compulsion of the Court's ruling in The Tungus v. Skovgaard,' to assure that it 'be applied evenhandedly'." Thibodeaux v. J. Ray McDermott & Co., 5 Cir. 1960, 276 F.2d 42, 47 n. 6, 1961 A.M.C. 1469, 1474 n. 6.

14. The existing state of the law has been summarized as follows:

 "The right effectively to recover for maritime death depends on a state death statute. The federal admiralty court * * * may enforce these rights. What those rights are depends on the state statute or, wherever necessary, the construction put upon the state statute by the courts of that state. In this approach the state has the power to incorporate or adopt within its death statute substantive maritime law principles of negligence and unseaworthiness. If it does, then the survivors will recover, as would the decedent, on admiralty principles whether in a state court, a federal diversity civil action, or the admiralty. Otherwise, if the state confines the standard to that for

**1024**

The first paragraph of this "single article [2315] forms the basis for all tort liability in Louisiana. Every case of tort at base gets its foundation in this article and must be referable to it. This is elementary and basic to any understanding of the tort doctrine in Louisiana". Stone, Tort Doctrine in Louisiana: The Materials for the Decision of a Case, 17 Tul.L.Rev. 159, 163 (1942). The second paragraph of the article provides for survival of an action in favor of the surviving spouse and children of a deceased injured person.

Article 2315, significantly placed at the beginning of the chapter entitled "Offenses and Quasi-Offenses",[15] reads in part as follows:

Art. 2315. Liability for acts causing damage; survival of action.

"Every act whatever of man that causes damage to another, obliges him

by whose fault it happened to repair it * * *.[16]

"The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, * * *. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased * * *."

 The issue here turns on the construction of the term "fault". Does Article 2315 encompass an action based on non-negligent unseaworthiness?

There is no Louisiana decision directly in point.[17] This, however, is not as

---

non-maritime common law situations, the admiralty takes the case with all of the limitations and defenses of the right. under that interpretation." Emerson v. Holloway Concrete Products Co., 5 Cir. 1960, 282 F.2d 271, 1961 A.M.C. 1484 (dissenting opinion).

15. The Louisiana Civil Code does not use the common law term "tort" or the French term "délit", but the word "offense". The inclusion of quasi-offenses in the chapter heading in itself suggests that articles 2315 and 2317 are not limited to actions based on negligence. By definition, a quasi-offense is one that is not necessarily based on negligence; it may be one where there is strict liability, regardless of negligence.

16. The quoted part of the first sentence of the article, as it now appears in the Louisiana Code, is identical with the wording of the corresponding article in the Codes of 1825 and 1808 and with Article 1382 of the Code Napoleon. James Brown and Moreau Lislet, redactors of the Digest of the Civil Laws of 1808 are thought to have relied on a projet du Gouvernement (1800), an early draft of the Code Napoleon. The general concept is expressed in Domat, The Civil Law in its Natural Order, Pt. I, Bk. II, Tit. viii, § IV, Art. 1 (Strahan's Tr. Cushing ed. 1861), but is traceable to the Lex Aquilia of Roman Law. Article 1382 of the French Civil Code provides: "Every act whatever of human agency

which causes damage to another, obliges the person by whose fault that damage has occurred to repair it." Article 2315 is substantially similar to codal articles in many civil law jurisdictions. See for example, Section 1802 of the Civil Code of Puerto Rico, quoted in the opinion in Compania Transatlantica. Espanola v. Melendez Torres, 1 Cir. 1966, 358 F.2d 209, a case similar to the instant case.

17. In Babin v. Lykes Bros. S.S. Co., La. App.1957, 94 So.2d 715, a widow and children brought an action to recover damages for the death of a longshoreman who had fallen from a vessel moored at a wharf in the Mississippi River. Judge Janvier, for the Orleans Court of Appeal, in the course of his opinion for the court, said. "Any admiralty or maritime cause of action, including any possible charge as to the unseaworthiness of the vessel, was abated by the death of Babin." But as the district judge in the instant case pointed out in his discussion of Babin: "A full reading of the Babin record and opinion will reveal that the issue of unseaworthiness was not put at issue. This is made crystal clear [from the briefs]." 235 F.Supp. at 107. The parties conceded that the case was controlled by the ordinary rules of negligence. Lamy distinguishes Babin in his article, Maritime Death Recoveries in Louisiana Under Seaworthiness—An Affirmative View, 11 Loyola L.Rev. 213, 219–224 (1962–63). But see Note, 40 Tul.L.Rev. 168 (1965).

high a barrier to Louisiana courts as it would be to courts in common law jurisdiction.[18] A Louisiana judge begins with the Civil Code and finds in the Code, expressly or by analogy, principles which may be applied to *all* cases.[19] When there is no express codal or statutory provision dealing with particular situations, Article 21 provides guidance for the courts:

"In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity.[20] To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

Professor Ferdinand F. Stone, Director of the Comparative Law Institute of Tulane University, has written extensively on the concept of fault in the civil law and tort doctrine in Louisiana.[21] He points out: "It is fair to say that the development of the Louisiana law of delictual [tort] responsibility in its formative period came principally through the use of Article 21. Such reception as there has been of the common law, Roman, French, and Spanish ideas stems from the use of Article 21." [22] Thus, in an early case of defamation, the Louisiana Supreme Court, after quoting Article 2315, said: "There is no arbitrary standard prescribed. Every act that causes damage, creates responsibility, and where the extent of that responsibility is not defined, or the law is silent, we must proceed under the 21st article of the Code, and decide according to natural law and reason, or received usage." Miller v. Holstein, 1840, 16 La. 395, 406. Louisiana courts, therefore, are not frustrated by the absence of de-

In Byrd v. Napoleon Avenue Ferry Co., E.D.La.1954, 125 F.Supp. 573, aff'd 227 F.2d 958, cert. denied 351 U.S. 925, 76 S.Ct. 783, 100 L.Ed. 1455, and in Hartford Accident & Indemnity Co. v. Gulf Refining Co., E.D.La. 127 F.Supp. 469, aff'd in part and rev'd in part, 230 F.2d 346 the district court held that the wrongful death statute of Louisiana, Article 2315, provided the substantive law as well as the remedy in a maritime death action based on negligence. He did not discuss whether Article 2315 encompasses an action based on unseaworthiness.

18. For example, see Moragne v. Marines Lines, Fla.S.Ct.1968, 211 So.2d 161. The Florida Wrongful Death Act, § 768.01, as amended, allowed recovery for death caused "by the wrongful act, negligence, carelessness or default of any ship, vessel or boat or persons employed thereon * * *." The Florida Supreme Court construed the statute as not allowing recovery for a wrongful death caused by unseaworthiness. "To hold that 'unseaworthiness' is within the contemplation of our Wrongful Death Act would be tantamount to judicial legislation; and this, of course, is beyond our constitutional power."

19. "The most striking example of the application of these civil law techniques is to be found in the mineral law * * * [a great body of law based] on provisions of the Civil Code adopted by analogy to meet circumstances and contingencies undreamed of at the time the Code was first adopted." Tucker, The Code and the Common Law in Louisiana, 29 Tul L. Rev. 739, 760 (1955).

20. The term "equity", of course, is not used in the Anglo-American sense of a system of equity as opposed to the common law. In fact, Article 21 was derived from a very similar provision in the projet du Gouvernement of the Code Civile. "[T]he purpose was to confine 'equity' to the role of closing the gap revealed by the unprovided and unanticipated case." Franklin, Equity in Louisiana, 9 Tul.L. Rev. 485, 495 (1935). The case before us is just such a case.

21. See Harris, Liability Without Fault, 6 Tul.L.Rev. 337 (1932); Miller, The Master-Servant Concept. 1 Loyola L.Rev. 25 (1941); Stone, Tort Doctrine in Louisiana: From What Sources Does It Derive? 16 Tul.L.Rev. 489 (1942); Stone, Tort Doctrine in Louisiana: The Materials For the Decision of a Case, 17 Tul.L.Rev. 158 (1942); Stone, Tort Doctrine in Louisiana: The Aggressor Doctrine, 21 Tul.L.Rev. 362 (1947); Stone, Louisiana Tort Doctrine: The Concept of Fault, 27 Tul.L.Rev. 1 (1953); Oppenheim, Survival of Torts Actions, 16 Tul. L.Rev. 386, 402–404 (1942); Howe, Studies in the Civil Law 194–200 (1896); Note, Offenses and Quasi-Offenses, 26 Tul.L.Rev. 394 (1952).

22. Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L.Rev. 1, 5 (1952).

cisional authority and the fact that the legislatures responsible for the Revised Civil Code of 1870, the Code of 1825, and the Digest of the Civil Laws of 1808 could not have anticipated The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 or the development of the doctrine of unseaworthiness prompted by the Jones Act.

Since fault is not defined in the Civil Code, Louisiana courts must refer to "natural law and reason, or received usages" as directed by Article 21. Professor Stone, points out that "fault" may be divided into three categories:

> At the time when the Louisiana courts were approaching this task of definition, the principal notions of fault, as developed in Roman and continental civil law were: unlawfulness or the doing of an act which was unlawful; *dolus* or the wilful harming of another; and *culpa* or the negligent harming of another. The common law of that time (beginning of the nineteenth century) through its writ system treated intentional and negligent injury as the primary touchstones of tort liability, but still retained some instances of strict liability. The common law had only begun that period of intensive development which led to the emergence of negligence as a separate tort. These were the dominant ideas known to Louisiana judges as the embodiment of reason elsewhere and as evidence of the natural law. The experience of a century and a half has shown that Louisiana Judges can find in the term (fault) a sufficient mirror of the times to adjust to an age of increased industrialization. As the jurisprudence shows, the courts have not considered "fault" to be merely moral blameworthiness; they have appreciated the fact that in this age the concepts of economic utility and social good have come perilously close to overshadowing

the concept of moral blame. Stone, Tort Doctrine in Louisiana, 27 Tul.L. Rev. 1, 9, and 18 (1953).

This Court applied Professor Stone's analysis in a products liability (cigarette) case.[23] Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir. 1963, 317 F.2d 19, 31. See also Williams v. Employers Liability Assurance Corp., 5 Cir. 1961, 296 F.2d 569. Liability of a shipowner for breach of the warranty of seaworthiness is analogous to the liability of a manufacturer or seller for breach of warranty of fitness. In effect, as the Louisiana Supreme Court said in Doyle v. Fuerst & Kraemer, 1911, 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480, the seller-manufacturer's "lack of knowledge is imputed to him as a fault". We said in *Lartigue*, "The reasoning in [Doyle v. Fuerst & Kraemer] indicates that the liability is delictual, imposed not because of the redhibition articles but because the party responsible for the product, in control of its preparation, and therefore in a superior position, breached his duty to the ultimate consumers who rely on him to furnish goods, reasonably safe for human consumption". 317 F.2d at 34.

The district court, in the instant case, properly emphasized that, in the words of Article 2315, "*Every act* whatever of man that causes damage to another, obliges him by whose *fault* it happened to repair it". "Fault", therefore, is "more inclusive and comprehensive than 'negligence'." The district judge, seasoned in Louisiana law after long experience at the bar and on the bench, concluded: "A review of the Louisiana jurisprudence convinces this Court that "fault" [under 2315] may be succinctly defined as a breach of duty or a want of that degree of care required in a given case. It is immaterial whether that duty is imposed by state statute, the common law or the maritime law. In any case the

---

23. The "civil law has always maintained that the interpretative process is not confined to the judges alone: those learned in the law, law teachers, writers of doctrine, are equally fit-perhaps more fit to interpret the code texts". Franklin, Book Review, Civil Code of the State of Louisiana (Ed.B.W.Dart, (1932)), 7 Tul.L. Rev. 633.

failure to perform the duty constitutes 'fault'." 235 F.Supp. at 108.[24]

The district court also noted that the Code "is replete with instances" of liability based on breach of duty where there is neither negligence nor intentional misconduct by the party liable. Under Article 667 an owner is liable to a neighbor for damage caused by new construction, even though he is not negligent and obtained the requisite building permit. Louisiana courts have held that under Articles 670, 2322, and 2315 an owner is liable for damages caused by the faulty condition of the premises, even though the owner could not reasonably discover the defective condition.[25] Article 2317 is important in this case. It provides: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, *or of things which we have in our custody.*" (Emphasis added). Several decisions of the Court of Cassation have applied the equivalent article in the Code Civile, Article 1384, to claims which are analogous to the plaintiff's claim in this case.[26] In these and other situations in which liability is imposed on a non-negligent person the fault is neither *dolus* nor *culpa*, but the doing of an unlawful act. In the situations specifically described in codal articles such as 667 and 2322, the legislature has defined the unlawful conduct. In the case of unseaworthiness, however, "reason" and "received usages" under Article 21, define the duty, breach of which constitutes the unlawful conduct that is the first category encompassed in the concept of fault. Here, for example, "received usages" require that a shipowner furnish a safe vessel. His warranty is similar to the manufacturer's warranty of fitness and to the property owner's warranty of safe construction. Looking at the Louisiana Civil Code as a whole, and especially at Articles 2315, 2317 and 21, the idea of liability without

24. The district court relied, in part, on an article by Lamy, Maritime Recoveries in Louisiana Under Seaworthiness—An Affirmative View, 11 Loyola L.Rev. 213 (1962–63). This is, as the title indicates, written from a plaintiff's point of view. See, however, the Note, 40 Tul.L.Rev. 168 (1965), taking issue with the decision of the court below.

25. Article 670 provides: "Every one is bound to keep his buildings in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers [passersby], under the penalty of all losses and damages, which may result from the neglect of the owner in that respect.

Article 2322 provides: "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

26. The corresponding article of the French Civil Code, article 1384, provides: "A person is responsible not only for the damage which he causes by his own action, but also for that which is caused by the actions of persons for whom he must answer or by things in his care" ("des choses que l'on a sous sa garde"). In an important and controversial decision the Court of Cassation applied this article to an action for damages brought against the owner of a steamtug by the widow of a member of the crew who was killed in a boiler explosion. The Court held that the owner of the tug could not avoid his responsibility by proving either the fault of the builder of the boiler or the hidden character of the defect. Gerissez, Cousin et Oriolle v. Teffeine, Cour de cassation, Chambre Civille, 16.6. 1896, D.P. 1897.-1.433 (note R. Saleilles, S. 1897.1.17; Paniol et Ripert, 6.No479). Similarly, in a case involving an explosion of a locomotive that destroyed two stained glass windows, the Court of Cassation again allowed recovery under Article 1384. The Court said: "As, in sum, the presumption of fault, established by paragraph 1 of 1384, on the part of the person who has under his guard (care) the inanimate object causing the damage, can be rebutted only by proof of a *cas fortuit*, a *force majeure*, or *cause étrangére* that cannot be imputed to him; as it is not sufficient to prove that he did not commit any [culpable] fault, or that the cause of it has not been determined." Chemins de fer de L'Ouest v. Marcault, *Cour* de Cassation, Chambre Civille, 21.-1.1919, D.1922, 1.25 (note Ripert), S. 1922.1.265 (note). See also the *Affaire* Jand'heur Ch. réun, 13.2 1930, D.1930. 1.57 (note Ripert) S. 1930. 1.121.

negligence is consistent with the civilian concept of fault.

Ships and seamen are not strangers to the Louisiana Civil Code.[27] Article 1074 of the Code of 1825, later Article 1081 of 1870, now supplanted by La.R.S. 9:1424, required a ship master to report the death of a person who died on his vessel. Articles 3534–35 still provide rules on prescription for actions of officers, sailors, and others of the crew for wages and for actions on the construction, equipping, and provisioning of vessels. Articles 3305 and 3289 provide for hypothecation of "powerboats, sailing vessels, pull boats, dredges, barges and all other kinds of watercraft." Articles 3237–48 rank privileges on ships including such items as pilotage, anchorage, and wages of the captain and crew.

We agree, too, with the district court's view that because of Louisiana's commitment to civil law, Louisiana would be the last jurisdiction to put a narrow interpretation on "fault" that would rule out as an applicable standard the maritime principle of seaworthiness. "Maritime law grew up and came of age under the tutelage of the civil law, and it still bears the imprint thus acquired, even when administered in the courts of common law

countries." Gilmore and Black, Admiralty §§ 7–8 (1957). And this is no latter-day rationalization of cyclonic developments in the *Sieracki-Ryan-Yake-Italia* [28] era as Benedict attests.[29]

The Supreme Court's definition of "unseaworthiness" as a "liability without fault" [30] represents the reaction of judges trained in the common law to equate fault with negligence or intentional misconduct. But when the judges on the Court of Appeals for the Third Circuit had to analyze more closely the concept of fault in *The Tungus* their thinking coincided with the civilian analysis of fault:

"It is urged that since unseaworthiness is spoken of as a species of liability without fault, it cannot be a 'wrongful act, neglect or default' within the meaning of the statute. However, the characterization of unseaworthiness as liability without fault is dangerously deceptive. For urgent and sound reasons of public policy, the law has imposed the absolute duty upon the shipowner to provide a seaworthy vessel, and liability results only as a consequence of the breach of that duty. If 'fault' means negligence alone, of course no fault is required, and to that

---

**27.** It is pertinent to note that before passage of the Jones Act a state statute giving damages for death caused by a tort might be enforced in a state court, although the tort was committed at sea, whether the accident happened near shore or in midocean. A vessel at sea was regarded as part of the territory of the state; a state wrongful death statute was not confined to deaths occasioned on land. Admiralty courts, of course, enforced claims based on such statutes. See Justice Holmes's opinion for the Court in The Hamilton, 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264.

**28.** See United States Lines Co. v. Williams, 5 Cir., 1966, 365 F.2d 332, 333, 1966 A.M.C. 2418.

**29.** Benedict, in the 1940 edition, paraphrasing essentially the older text, had this say:

"The admiralty law is indebted for many of its characteristics to the circumstances of the countries in which it was first administered. The countries

that earliest reduced the law of the sea to a system, and adopted codes of maritime regulations, having been countries in which the Roman or civil law prevailed the principles of that great system of jurisprudence were incorporated with, and gave character to, the maritime law; and so much were pure reason, abstract right, and practical justice mingled in that system, and so important was it that the general maritime law should be uniform and universal, that, in England, where the common law was the law of the land, the civil law was held to be the law of the admiralty, and the course of proceedings in admiralty closely resembled the civil law practice."

**30.** "[Unseaworthiness] is essentially a species of liability without fault * * * neither limited by conceptions of negligence nor contractual character. * * * It is a form of absolute duty * * *." Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099.

extent only, the phrase 'liability without fault' is accurate. But to say that one who breaches a duty is without fault is a logical as well as a legal incongruity." Skovgaard v. The M/V Tungus, 3 Cir. 1957, 252 F.2d 14, 17, aff'd 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524.

In Compania Transatlantica Espanola, S.A. v. Melendez Torres, 1 Cir. 1966, 358 F.2d 209, the First Circuit was confronted with the problem of construing Section 1802 of the Puerto Rican Civil Code, an article very similar to Article 2315 of the Louisiana Civil Code.[31] Both are derived from Article 1382 of the Code Napoleon.[32] The Court quoted the Third Circuit's language in *The Tungus*, and then said:

> Under this section the word 'fault' should not be equated with the word 'negligence'. Each word has its own independent meaning. Fault encompasses something different than negligence. It means breach of obligation. Any breach of warranty or obligation is fault within the meaning of this statute whether imposed by law, by contract or by statute. Unseaworthiness is such a breach. Clearly either fault or negligence will support recovery under Puerto Rican law. Mendez v. Serracante, 53 P.R.R. 807 (1938). [358 F.2d 209 at 213.]

The result reached in these two civilian jurisdictions has been reached in most,[33] but not all common law jurisdictions where the question has arisen.[34]

## VI.

## UNSEAWORTHINESS OF THE BARGE

The Shipowner, Aiple, sharply attacks the finding of the Trial Judge that the Barge was unseaworthy. As discussed in Part V it also contends that even though the Barge was unseaworthy, no right of recovery exists under the Louisiana death statute for non-negligent unseaworthiness.

The findings of the District Court on unseaworthiness may be briefly paraphrased. On the arrival of the Barge at the Olin dock, she was listing noticeably to starboard because of the unusual and abnormal accumulation of water in the No. 2 starboard wing tank. This tank is designed to provide buoyancy to the Barge and should, therefore, contain no water. Inspection revealed that there was 2'3" of water in this tank. In this condition the Barge was not reasonably fit to carry the cargo of sodium nitrate which she had undertaken to transport. Moreover, the hatch cover wings to the No. 2 starboard wing tank were corroded and sealed tightly. The wing tank contained some carbon monoxide and was oxygen deficient to the extent that those who entered lost consciousness. No inspection of the tank had been had since

31. Section 1802 of the Puerto Rican Civil Code provides:
 "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done, * * * "

32. See note 16.

33. See The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, 1959 A.M.C. 813; Holly v. S.S. Manfred Stansfield, 4 Cir., 1959, 269 F.2d 317; Union Carbide Corp. v. Goett, 4 Cir. 1960, 278 F.2d 319, 1960 A.M.C. 1119; Maryland ex rel. Smith v. A/S Nabella, D.Md., 1959, 176 F.Supp. 668, 1959 A.M.C. 2196; Vassallo v. Nederl-Amerik Stoomv Maats Holland, Tex., 1961, 162 Tex. 52, 344 S.W.2d 421. See also Weed v. Bilbrey, Fla.Ct.App., 1967, 201 So.2d 771, 774 n. 2, reversed, Fla., 1968, 215 So.2d 479.

34. Florida is a surprising exception, since its survival statute speaks in terms of "libels in rem", a maritime, not local, concept. See Moragne v. State Marine Lines, Inc., Fla., 1968, 211 So.2d 161. Article 2315 does not contain an in rem provision. However, Louisiana statutes allow proceedings in rem against an "offending vessel" "where any injury, loss or damage is caused or occasioned within the territorial jurisdiction of the State of Louisiana to the person or property of any person by carelessness, neglect or want of skill in navigation, direction or management of any vessel * * *." La. R.S. 34:802, 803 (1950).

December 9, 1961. On this, the Court found the Barge to have been unseaworthy.

On this finding of unseaworthiness, it was, of course, a perfectly natural and inescapable conclusion that since this condition caused Grigsby to lose consciousness and drown in the accumulation of water in the No. 2 starboard wing tank, the unseaworthiness was a proximate cause of his injuries and death.

This matter of unseaworthiness of the Barge poses somewhat unusual problems. In our analysis, however, we are aided if we dispose of positions at each extreme which are simply untenable with respect to the peculiar circumstances of this case. It is well to reemphasize here that the duty of seaworthiness arises because Grigsby had the vicarious status of a seaman—either as one engaged in life salvage or, as a corollary, one engaged in the Good Samaritan rescue of Sonnier and Morgan, each of whom admittedly were doing repair work, the traditional work of seamen to thus become vicarious seamen themselves. The point of significance is, therefore, that it was the presence of the water in the wing tank and the consequent list to the Barge which was the sole occasion for the three of them to be aboard the Barge at the time and under the circumstances presented. We may assume that with this list the Barge was unseaworthy *vis a vis* the cargo and the shipper of cargo. But there is no warranty that the vessel is seaworthy with respect to the unseaworthy condition which is directly responsible for bringing aboard the persons claiming the benefit of the warranty. We agree with the Second Circuit in McDaniel v. The M/S Lisholt, 2 Cir., 1960, 282 F.2d 816, 1961 A.M.C. 25:

"We need pause only briefly with libelant's assertion that he was entitled to a warranty of seaworthiness. The short answer is that the contention was disposed of by this court's prior decision, since we do not read the Supreme Court's opinion as disapproving our ruling on this issue. As we there stated, 'There can be no duty to furnish a seaworthy ship to a fireman who was on the vessel knowing it to be unseaworthy, and was on board because of its unseaworthiness.' 2. Cir., 257 F.2d 538, 540. See also West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161; Filipek v. Moore-McCormack Lines, Inc., 2 Cir., 258 F.2d 734, certiorari denied 359 U.S. 927, 79 S.Ct. 605, 3 L.Ed.2d 629; Bruszewski v. Isthmian S.S. Co., 3 Cir., 163 F.2d 720, certiorari denied 333 U.S. 828, 68 S.Ct. 451, 92 L.Ed. 1113."

The same may be said, we think, with respect to another extreme—the oxygen deficiency of the tank, (or the presence of carbon monoxide gas presumably resulting also from the natural process of oxidation). A wing tank is to supply buoyancy. It was supplying buoyancy although it also produced a list. The wing tank is not present or designed for the purpose of safely carrying men. A wing tank is expected to be kept closed. As a compartment intended to be tightly closed and sealed for long periods of time, it is expected that there will likely be an oxygen deficiency which itself makes it dangerous for tank entry unless precautions are taken.

Consequently, if confined precisely to the particular reasons given by the Trial Court we would have much doubt that they would sustain the holding of unseaworthiness.

On the other hand, the Shipowner's effort to press the literalism of West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, 1960 A.M.C. 15, must fail here just as it did recently in Lusich v. Bloomfield S.S. Co., 5 Cir., 1966, 355 F.2d 770, 1966 A.M.C. 191. It would, to be sure, be a nice day for shipowners if under a bareboat charter of a manned vessel or a charter of almost any kind of an unmanned vessel, the owner could absolve itself of all of the traditional obligations of furnishing a seaworthy vessel merely because the owner was not in the physical possession and control of the craft and, on the contrary, the possession and control was in the hands of the charterer. Obviously, of

course, the absence of possession and control may well insulate the shipowner from a liability in personam in the absence of conduct which somehow implicates the remote owner in the deficiency.[35] But on principles of *in rem* liability, or concepts akin to it, there seems to be no more reason for the physical absence of an owner's representative universally to insulate the vessel from accountability for personal injuries occasioned by unseaworthiness than there is to absolve the vessel from *in rem* liability for, say, other types of maritime torts including collision, even though the vessel, on this hypothesis, is wholly in the control of a demise charterer and, worse, being conned by a compulsory pilot.[36]

Thus, in *West*, had the vessel been in the regular course of operation under a demise charter from the United States (her owner), to a private company as bareboat charterer, and had the claimant sustained his injuries from a condition other than that being repaired, we have no doubt that liability at least on principles *in rem* would have existed and would have been enforceable against the government under the Public Vessels Act, 46 U.S.C.A. §§ 781–790. We, therefore, decline, with deference to pursue the literalism of the Fourth Circuit in Union Carbide Corp. v. Goette, 4 Cir., 1960, 278 F.2d 319, 1960 A.M.C. 1119, cert. denied, 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55.[37] The principle of West does not therefore extricate the Shipowner as it hopefully urges.

As the facts which give rise to this inference are virtually without dispute and rest almost altogether on other fact findings having the buoyancy of F.R.Civ.P. 52(a), we thing it appropriate for us to affirm the finding of unseaworthiness although on a different ground. The unseaworthines here is not the antecedent condition of the Morton Salt Barge #2, either upon arrival at Olin's dock, or at the time Coastal's men started to perform their engagement. Here the unseaworthiness is confined narrowly to that point of time commencing with Sonnier's undertaking to go into the wing tank. The tank entry was done with the full knowledge of Coastal's representatives. Indeed, it was done to effectuate Coastal's work—the discharge by portable pump of the water accumulated in the wing tank. Obviously the tank was not safe for men at that time, either actually or under applicable safety regulations (see notes 52, 53, *infra*). Even though the tank was not meant to be safe for persons, once it became necessary to enter it, the service contractor had the obligation not to perform its

---

**35.** There are, of course, circumstances in which *in rem* liability will also be lacking for want of requisite control. See Moye v. Sioux City & New Orleans Barge Lines, Inc., 5 Cir., 1968, 402 F.2d 238.

**36.** Griffin, Collision, § 244, at 553 (1949): "Thus a vessel is liable *in rem* for collision, although she is under demise charter and the master and crew are therefore the charterer's servants * * *."; 1 Benedict, Admiralty, § 132, at 362–363 nn. 63, 64 (1940); Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique, 1900, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155; The China, 1868, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67. Cf. Reed v. The Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373.

**37.** Following trial after remand from the Supreme Court, see note 13 *supra*.
We do not put in the same class the decision of Judge Ainsworth, then District Judge, in Hurst v. Point Landing, Inc., E.D. La., 1962, 212 F.Supp. 160, 162. Although the opinion discusses the absence of control, the opinion and decision, however, correctly analyze *West* in terms of the reason for the vessel undergoing repair and the presence of the injured person aboard at the time of the occurrence. "There is no doubt that the barge was unseaworthy; this was the reason for its being at the Avondale wet dock, that is, for the removal of the condition which caused it to become ·unseaworthy—the defective hatch cover which would not fully close. It would be manifestly unfair to penalize a shipowner for performing his duty in taking the necessary steps to make his ship seaworthy. * * * The primary reason for libelant being aboard the barge was the performance of his duties to Avondale * * *."

**1032**

work in a way which would make the vessel unseaworthy, *i. e.*, unfit for men. Here a man was about to enter the wing tank. The tank was then not reasonably fit for the presence of men. It was not reasonably fit for the presence of men because the contractor had failed and continued to fail to take those steps which were required to make it reasonably safe —*i. e.*, test, ventilate or equip workers with the safety appliances needed (see note 53, *infra*).

To this extent, it was the action of the contractor which created the unseaworthy condition. But at least since Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, 1954 A.M.C. 860, this has been enough.[38]

But so typical of this Tinker-to-Evers-to-Chance [39] struggle there is an instinctive reflex by each side. Thus, the Shipowner, conceding with no enthusiasm that an independent contractor can be the instrument by which the vessel becomes unseaworthy to thereby launch unlimited liability against the ship (and hence her owner) asserts that there must be a time, sequential limitation, otherwise the contractor's conduct creates "instant unsea-

worthiness" as to which our subsequent *Antoine* and *Robichaux* [40] cases deny vessel liability. With like simplicity, the argument of the claimants merely anticipated in point of time that which can now be charaterized in terms of *Mascuilli* [41] even though it has come out since the decision below. The *Mascuilli* is also one of extravagantly simple absolutes. It is the direct one that *Mascuilli* now means to affirm that "instant unseaworthiness" resulting from the "operational negligence" of the contractor at the very moment of injury subjects the ship to the absolute unseaworthiness liability.

We think neither of these extremes is warranted here. We agree, of course, that in *Antoine* and *Robinchaux*, this Court rejected categorically the notion of "instant unseaworthiness". But that is of no help to the Shipowner here since the contractor's negligence extended over an appreciable period of time. On the other hand, the claimants' efforts to circumvent altogether a time factor on the basis of *Mascuilli* are equally wanting.[42]

With deference to our brothers in the Fourth Circuit we decline to follow their

38. See Gutierrez v. Waterman S.S. Co., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L. Ed.2d 297, 1963 A.M.C. 1649; Weyerhaeuser S.S. Co. v. Nacirema Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, 1957 A.M.C. 645. See also, Italia Societa v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732, 1964 A.M.C. 1075; Ferrante v. Swedish American Lines, 3 Cir., 1964, 331 F.2d 571, 1964 A.M.C. 2268, cert. denied, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed. 2d 20; Thompson v. Calmar S.S. Corp., 3 Cir., 1964, 331 F.2d 657, 1964 A.M.C. 2249, cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184; Blassingill v. Waterman S.S. Corp., 9 Cir., 1964, 336 F.2d 367, 1964 A.M.C. 1932: Bue, Admiralty Law in the Fifth Circuit—A Compendium for Practitioners: I, 4 Hous.L.Rev. 350, 397–399 (1966).

39. United States v. Seckinger, 5 Cir., 1969, 408 F.2d 146, 153 [Feb. 28, 1969].

40. Antoine v. Lake Charles Stevedores, Inc., 5 Cir., 1967, 376 F.2d 443, cert. denied, 389 U.S. 869, 88 S.Ct. 145, 19 L. Ed.2d 146; Robichaux v. Kerr McGee

Oil Indus. Inc., 5 Cir., 1967, 376 F.2d 447. To these should be added Taylor v. S.S. Helen Lykes, 5 Cir., 1968, 402 F.2d 777, aff'g E.D.La., 1967, 268 F.Supp. 932, involving a *Yaka* seaman-longshoreman's action against his employer's vessel. See also Note, Operational Negligence of Longshoreman Occurring at Moment of Injury to Co-Worker Does Not Render Vessel Unseaworthy, 5 Hous.L.Rev. 371 (1967). *Cf.* Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503.

41. Mascuilli v. United States, 1967, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743, 1967 A.M.C. 1702.

42. This question is presented directly in several cases, perhaps obliquely in some, now pending before other panels of this Court. See Luckenbach Overseas Corp. v. Usner, No. 25344; Wilson v. Societa Italiana de Armamento, 5 Cir., 409 F.2d 484; Duncan v. Transeastern Shipping Corp., No. 26672; Patterson v. Humble Oil & Refining Co., No. 26365.

holding in *Satchell* [43] and that written for the panel by Judge Sobeloff in *Venable* [44] that *Mascuilli* rejects out of hand that so-called "operational negligence" defense to thereby impose absolute liability for the resulting "instant unseaworthiness".[45]

This means that we part company at the same time with our distinguished brothers of the Second Circuit if—and the if can be a big one—the concurring opinion of Judge Leonard P. Moore on rehearing in *Candiano* and *Alexander* [46] speaks for the Court in the views which indicate that close analysis of intracircuit undulations, aberrations and enigmas, of his own and other (including the Fifth) Circuits had led him to substantial second thoughts about "instant unseaworthiness" and *Mascuilli*.

A number of beacons chart the course in this direction. Foremost, perhaps, is the unlikelihood of the Supreme Court undertaking to make such a sweeping choice in the heavy seas of conflict by such an unilluminating pronouncement. Next, examining the only cases cited—*Mahnich* [47] and *Crumady* [48]—likewise reveals no intrinsic evidence of any such sweeping purpose. As for *Mahnich,* it was an early forerunner of what few could then expect would shortly be let loose by *Sieracki* [49] that merely held that it was the ship or her equipment being used, not the negligence of crew members in selecting the faulty from the good which determined unseaworthiness. As for *Crumady*, its citation was an indication of precision, not generalization since in both *Crumady* and *Mascuilli* the injury resulted from the failure of the safety circuit breaker devices to work properly either from deficiencies or prior improper setting.

Of course, nothing we say about what the Supreme Court said or thought it said can add much to what was said or what it will say it said. How we have divined it may be rejected by an expansive analysis of why the cryptic deliverance of *Mascuilli* was the message from Delphi in the words of perhaps latter-day spokesmen, that under the law "the very finding of operational negligence is a simultaneous finding of unseaworthiness—[since the] —alchemy is instantaneous." [50]

The result is that we adhere to *Antoine* and *Robichaux*, but faithful to them we find the ample facts on which to predicate unseaworthiness resulting from the negligence by the contractor in the performance of its work.

The decree against the Shipowner was therefore correct.

## VII.

### COASTAL'S NEGLIGENCE

██ The Trial Judge found the conduct of Coastal to be so wanting as to characterize it as gross negligence. For a number of reasons we think this was clearly justified and so much so that only the briefest comment is warranted.

There was first a patent violation of subpart B, § 8.11 of the Safety and Health Regulations for Ship Repairing, 29 C.F.R. § 8.1, et seq. (Now 29 C.F.R. §

43. Satchell v. Svenska Ostasiatiska Kompaniet, 4 Cir., 1967, 385 F.2d 76.

44. Venable v. A/S Det Forenede Dampskibsselskab, 4 Cir., 1968, 399 F.2d 347.

45. The unrevealing per curiam opinion of the full court on rehearing en banc, 4 Cir., 1968, 399 F.2d 355, may be the enigma wrapped in mystery. Although the order as published does not so reflect, direct communication with the Clerk of that Court confirms that the order was signed by the full Court.

46. Candiano v. Moore-McCormack Lines, Inc., 2 Cir., 1967, 386 F.2d 444, on petition for rehearing of 382 F.2d 961, 1967 A.M.C. 2312; Alexander v. Bethlehem Steel Corp., 2 Cir., 1967, 382 F.2d 963, 1967 A.M.C. 2324.

47. Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, 1944 A.M.C. 1.

48. Crumady v. The Joachim Hendrick Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, 1959 A.M.C. 580.

49. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698.

50. From Foley Square, not Mount Olympus these are the words of Moore, J., 386 F.2d at 449.

1501, et seq. (1968)).[51] The regulations are structured so as to place immediate responsibility for compliance on the employer of an employee who "in whole or in part" is engaged in ship repair or "related" work as broadly defined.[52] The hazards of tank entry and precautions to be taken are contained in subpart B—Explosive and Dangerous Atmospheres and of immediate importance is § 8.11(b) (now § 1501.11(b)) concerning "oxygen deficient atmospheres".[53]

51. To parallel Judge Hunter's opinion we continue references to § 8 etc., and have inserted the later renumbering (§ 1501, etc.). These were promulgated by the Secretary of Labor under the authority of Public Law, 85–742, 72 Stat. 835, 33 U.S.C.A. § 941 (1958). See 1946 Reorg. Plan #2, § 3, 60 Stat. 1095; 1950 Reorg. Plan #19, § 1, 64 Stat. 1271.

52. The Purpose and Authority of the regulations is described in Section 8.1(a) of Subpart A as follows:

"Subpart A—General Provisions

"§ 8.1. Purpose and Authority

"(a) The Longshoremen's and Harbor Worker's Compensation Act (44 Stat. 1424; 33 U.S.C. 901 et seq.) provides compensation for injuries suffered by employees when they are working for private employers within the Federal maritime jurisdiction on the navigable waters of the United States, including dry docks. Public Law 85–742, 72 Stat. 835, approved August 23, 1958, which amends section 41 of the Longshoremen's and Harbor Workers' Compensation Act, as amended (44 Stat. 1444; 33 U.S.C. 941) requires, among other things, that every employer of the aforementioned employees 'shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees.' It is the purpose of the regulations of this part to carry out the intent of Public Law 85–742." (Now § 1501.1).

The Scope and Responsibility for compliance with the regulation is established in Section 8.2(a), which reads:

"§ 8.2 Scope and Responsibility

"(a) The responsibility for compliance with the regulations of this part is placed upon employers any of whose employees are engaged in any ship repair or related employments aboard any vessel upon the navigable waters of the United States, including any dry dock or marine railway, where an injury to such employees would be within the jurisdiction of the Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424; 33 U.S.C. 901 et seq.) as amended." (Now § 1501.1).

Pertinent terms defined in Section 8.3 are as follows:

"§ 8.3 Definitions

"(c) The term 'employer' means an employer any of whose employees are employed, in whole or in part, in ship repair or related employments as defined in this section within the Federal maritime jurisdiction on the navigable waters of the United States, including dry docks and marine railways.

(i) The term 'ship repair' means any repair of a vessel including, but not restricted to, alterations, installations, cleaning, painting, and maintenance work.

(j) The term 'related employments' means any employments performed as an incident to or in conjunction with ship repair work, including, but not restricted to, inspection, testing and employment as a watchman." (Now § 1501.2).

53. "Subpart B—Explosive and Dangerous Atmospheres

"§ 8.11 Precautions Before Entering

"(a) Gassy atmospheres. (1) Before employees are initially permitted to enter any of the following ship's spaces either the atmosphere shall be considered to be immediately dangerous to life and the employees shall be protected in accordance with the provisions of § 8.82(a) and (b) or the atmosphere shall be tested by a competent person to ensure that it is safe.

(i) Cargo spaces or other spaces containing, or having last contained combustible or flammable liquids or gases in bulk.

(ii) Cargo spaces or other spaces containing or having last contained bulk liquid or gas cargoes of a poisonous, corrosive, or irritant nature.

(iii) Spaces immediately above or adjacent to those described in subdivisions (i) and (ii) of this subparagraph.

(iv) Spaces that have been fumigated.

The work being done by Coastal, if not that of a "ship repairer," § 8.3(d) (now § 1501.2(d)) was clearly "related employment," § 8.3(j) (now § 1501.2(j)) (See note 52, *supra*). Responsibility for compliance therefore rested directly on the elder Morgan, in charge, and in his absence on his son Edward, who, although young in years, was old in experience as a maritime worker with—on his own admission—full knowledge about the hazards of tank entry and the accepted precautions to minimize risk and injury. This responsibility extended both to the employees of Coastal and those of others who, as Sonnier, were there taking an active part in carrying out Coastal's work.

With respect to both Sonnier, who first entered the tank, and Grigsby who entered later, Edward, then momentarily in charge of the operation, failed to comply with § 8.11(b) (now § 1501.11(b)). He neither treated the tank as one "immediately dangerous to life" thus bringing into play the precautions of § 8.82(a)

 (2) If the atmosphere is found to be safe, the provisions of § 8.12 shall apply.
 (b) Oxygen deficient atmospheres. (1) Before employees are permitted to enter any spaces not covered by paragraph (a) (1) of this section, or any sealed compartments or other spaces which have been in a state or preservation, or any poorly ventilated compartments which have been freshly painted, either the atmosphere shall be considered to be immediately dangerous to life and the employees shall be protected in accordance with the provisions of § 8.82(a) and (b), or the atmosphere shall be tested with an oxygen indicator or other suitable device to ensure that it contains sufficient oxygen to sustain life.
 (2) For purposes of this paragraph, an atmosphere containing 16.5% oxygen or capable of supporting a flame shall be considered to contain sufficient oxygen to sustain life.
 (3) Mechanical ventilation which will provide at least one complete change of uncontaminated air may be substituted in lieu of either of the requirements of subparagraph (1) of this paragraph." (Now § 1501.11).
Section 8.82(b) (3) provides:

(b) (now § 1501.82(a) (b)) nor, as alternatively permitted, did he test the atmosphere, § 8.11(b) (now § 1501.11 (b)). Actually things were worse, and more vivid, when Grigsby entered in his instinctive role of life salvor. For in the meantime Edward had seen Sonnier enter the tank and, in just a moment, saw that as Sonnier "let go of the hose * * * his head rolled back and his eyes shut and then he just went limp * * * [there being] no question about it * * he was unconscious when he went over." Ironically, Coastal is again confronted with its own contradictions for if, to secure a finding against Grigsby of contributory negligence as a matter of law "Grigsby could see Sonnier and Morgan" and their plight (see note 12, *supra*) then the conditions were all the more demanding of Edward as Grigsby started to go in.

With the regulations directed as were these to the specific hazard which produced the injury, the violation of them, constitutes negligence without more.[54]

 "Work in atmospheres immediately dangerous to life shall be performed only in an emergency, as when rescuing a man who has been overcome or when shutting off a source of contamination that cannot otherwise be controlled. When an employee enters such an atmosphere he shall be provided with and use an adequate, attended life line." (Now § 1501.82(b) (3))

54. Marshall v. Isthmian Lines, Inc., 5 Cir., 1964, 334 F.2d 131, 1964 A.M.C. 1686.
 "The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself." Prosser, Torts, § 34, at 161 (2d ed., 1955); and Restatement, Torts § 286 (1934). Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660, 1964 A.M.C. 2279, cert. denied, 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971; Kernan v. American Dredging Co., 1958, 355 U.S. 423, 78 S.Ct. 394, 2 L.Ed.2d 382, 1958 A.M.C. 251; Skipper v. Amerind, E.D.La.1964, 230 F.Supp. 253, 1964 A.M.C. 1155.

When to the statutory fault is added violation of standards of prudence imposed by maritime law (indeed all other, common and civil) Coastal's conduct is equally wanting. In none of these situations where warning by one with both superior duty and knowledge was called for did Edward sound it. Moreover, this was compounded by erroneous information which at one point, almost expressly denied the presence of gas, and led all then concerned with what was going on to think that a man had merely fallen and broken (or severely hurt) his back.

## VIII.

### WELDERS' NEGLIGENCE

In attacking the Trial Court's finding of negligence against it, Welders concentrates on the application to it of the Ship Repair Safety Regulations (see notes 52, 53, *supra*). It does this because, it asserts, and correctly so, that in reality this is the sole fault found by the Court as to Welders.

This attack rests, it seems to us, primarily on the nature of Welders' general business, not the activity being performed at the time in question—at the time the work was going on. Thus its brief poses the rhetorical question: "Can it, then, logically be said that this regulation was intended to apply to a company whose sole, exclusive business was the retail sale and rental of welding supplies, which had absolutely no connection with ship repair work as an employer, and the only conceivable 'connection' that it did have with ship repair was that it had a few customers who were, themselves, engaged in such work?"[55]

The question, it seems to us, answers itself. First it is intrinsically contradictory. An activity is not the "sole, exclusive business" if, as the question affirms, this included serving "customers who were, themselves, engaged" in ship repairs. Next, it does not matter whether, on a comparative basis, the volume of business done is great, greater, small or smaller if, with respect to the activity in question, it comes within the regulations. Thus it is immaterial that out of the entire business, that of servicing such ship repairer "customers comprised a very small portion of Welders' clientele."

◼ This is not, as Welders' arguments always seem to assume, the case of a supplier of equipment (here welding or pumping machinery) being held to be a ship repairer under the regulations merely because equipment was furnished. Whether, and to what extent, the regulations would then apply is for another day and another court. Here, Welders not only furnished pumps but furnished substitute pumps when the initial ones apparently did not work properly. More than that, their representative, Sonnier, undertook to service the equipment and, indeed, undertook to operate it. With the combination of these operational activities, Welders came under the Act as an employer whose employees were at that time engaged at least in "related employment" performed "as an incident to or in conjunction with ship repair work" (§ 8.3(j) (now § 1501.2(j)) which, of course, includes "cleaning, * * * and maintenance work." (§ 8.3(i) (now § 1501.2(i)) (see note 52, *supra*). The regulations are part of the federal scheme to both provide for compensation in the event of an industrial accident and to prevent accidents in activities within the coverage of the Longshoremen's Act, 33 U.S.C.A. § 941.[56] There can be no question that for the work then being done for Welders by Sonnier, Welders was subject to that Act. Calbeck v. Travelers Ins. Co., 1962, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368, 1962 A.M.C. 1413.

Once application of the regulations is established, the evidence more than justifies the finding of negligence based on violation of them. There had never been any instruction by Welders to Sonnier or its other employees. Consequently, Sonnier was completely ignorant of the ex-

---

55. Brief for F & C on behalf of Welders at 10.

56. See purposes of the regulations, set out in § 8.1(a) (now § 1501.1(a)), note 52, *supra*.

istence of the regulations or their requirements and, worse, he was completely oblivious to the hazards of tank entry.[57]

## IX.

### F & C's WATERCRAFT EXCLUSION— WELDERS AS SHIP REPAIRER

After undertaking the defense of Welders without any indication that its activities were other than in the vigorous assertion of the partisan rights of its Assured,[58] the Liability Insurer for Welders, F & C, informed other counsel on the eve of trial that it intended to assert lack of coverage. It renews it here. The theory is a very simple one. If, as the Trial Court held, and we have just affirmed, Welders was subject to the safety regulations (notes 52, 53, *supra*) because it was an employer of employees doing ship repair or related work, then there is no coverage because the Assured, Welders, was obviously engaged in the "ownership, maintenance, operation, use, loading or unloading of" a vessel, which is excluded under the typical watercraft exclusion.[59]

The Trial Court, wisely we think, read the exclusion as though the words "by the assured" were read into the main defining clause so that it would read:

"This policy does not apply * * * to the ownership, maintenance, operation, use, loading or unloading of watercraft *by the assured.*"

This makes sense and, contrary to the contention of F & C, the clause is not al-

together free of doubt. There is some ambiguity. There is a need for construction. At this late date, it is an affectation to cite cases as to what occurs in that situation with an insurance policy. Of course, the argument can work both ways, but it is significant that F & C either has been unable to find any case or at least has failed to cite any which supports this literal reading.

Many factors point in the other direction. While it is true that we have held that the work being done by Sonnier had the force of making his employer for that operation into one engaged in ship repairing so far as coverage of that Federal Act was concerned, this is a long way from holding that Welders was in fact or in law engaged in "maintenance" of the Barge. The "maintenance" was being performed by Coastal, and Welders' role was to supply the needed pumps. Additionally, if the literal reading were applied, it would exclude liability for damage to the vessel simply because of its status as one then undergoing "maintenance, operation, use, loading or unloading." Thus, for example, had a truck operator driving this Assured's truck on the dock, to which the Barge was moored, but whose mission was in no way connected with the vessel, negligently caused the truck to crash into the side of the ship, doing damage to the vessel and injuring crew members, there would be no coverage. This changes the exclusion from an operational status to the nature of the

---

57. All that is left as far as Welders is concerned is (a) the intramural controversy, asserted belatedly, by its Insurer, F & C, that there was no coverage, and (b) its contention that Welders should have had a decree against Coastal. See Parts IX, X *infra*.

58. "The Fidelity and Casualty Company of New York agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy: "I. Coverage A—Bodily Injury Liability. To pay on behalf of the insured all sums which the insured shall become legally ob-

ligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."

59. *"This policy does not apply: * * * (d)* Under coverages A and C, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract as defined herein, *to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft* if the accident occurs away from premises owned by, rented to or controlled by the named insured * * *."* (Emphasis added.)

victim (vessel). This exclusion seems patently intended to declare that with respect to those risks which are normally the traditional undertaking of a marine underwriter, the Insurer was not extending to this Assured protection for any of his activities of that kind.

The Insurer seeks too much when it demands of this or any other court that a policy provision so broadly and in part so vaguely worded must be construed with absolute consistency with the construction of statutory regulations which came into being much later and for a much different purpose. It is enough to say that in this world which can become quite complex, Welders was doing something which the Federal law denominated the work of a ship repairer. It is held to the obligations of that statutorily defined ship repairer. It is such obligations that F & C underwrote. On the other hand, the policy is intended to exclude coverage when the use or maintenance, loading or unloading of the vessel is that of the Assured. And as between Underwriter and Assured, that depends on whose work was being done, what work was being done, and that adds up to the permissible conclusion of the Trial Judge that this was not here "maintenance of the barge by Welders."

The policy defense therefore fails.

## X.

## WELDERS' CONTRACTUAL INDEMNITY FROM COASTAL

Welders (now once again joined by its sometime ally and Insurer F & C) seeks reversal of the District Court's denial of indemnity in favor of Welders against Coastal on the basis of the express indemnity agreement contained in the rental agreement.[60]

Probably at this point the admiralty Judge must forsake his amphibious woolsack, Guillot v. Cenac Towing Co., 5 Cir., 1966, 366 F.2d 898, 1966 A.M.C. 2685; Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 1962 A.M.C. 1710, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276, and return to that less expansive function of *Erie*-seeking Louisiana law. The contract is not maritime and if it were, this aspect seems more like insurance and now much latitude is left to the states even as to maritime insurance. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. Thus this Louisiana-trained Judge was faced with the problem of Louisiana policy considerations on indemnity contracts indemnifying one against his own negligence.

In making this choice, and it is a choice of state policy, not, as supposed, a mere construction of words which are said to require no construction, American Ag. Chem. Co. v. Tampa Armature Works, 5 Cir., 1963, 315 F.2d 856, 860 (concurring opinion), it is couched in terms of divining the so-called intent of the parties in making the contract. This starts by the Court putting itself in the position of the parties.[61] With this starting point, in American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657, followed by this Court in Gulf, C. & S. F. Ry. Co. v. Coca-Cola Bottling Co., 5 Cir., 1966, 363 F.2d 465, and Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1962, 296 F.2d 256, cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18,[62] we held that it was hardly reasonable to assume that in the

---

**60.** "The undersigned shall indemnify and keep harmless Welders from and against all loss or damage arising out of any injuries to or death of persons, and damage to or destruction of property, including without limitation property of the undersigned, arising from, incident to, connected with or growing out of the use and/or possession of the property by the undersigned, and the undersigned shall pay Welders all costs and counsel fees incurred by Welders in connection therewith."

**61.** United States v. Seckinger, 5 Cir., 1969, 408 F.2d 146, [Feb. 28, 1969].

**62.** But see *Seckinger*, note 61, *supra*, where in n. 10 the Court demonstrates that Florida has rejected *Jacksonville*. *Jacksonville* therefore has no vitality for Florida and certainly none for Louisiana.

making of such an engagement concerning the work to be done (in *Hart*, a pipe standard with a built-in defect, here a small machine (water pump) temporarily leased for a rental charge of a few dollars), there was any expectation that the parties intended to take on the unlimited obligations of insurers who, as professionals, both collect a premium commensurate with developed experience and, more significant, put a dollar limit on their exposure.[63]

Here the Court has held that each of the parties to the contract was guilty of statutory fault under the same statutory regulatory scheme.

■ The indemnity contract (note 60, *supra*) does not expressly protect the indemnitee against the indemnitee's own negligence. While for different states and different contracts, different constructions are permitted, all seem to agree that the purpose to take on a responsibility for the indemnitee's own misconduct has to be reflected by plain language in the total agreement.

■ Giving great consideration as we should in matters of Louisiana law to the Trial Judge here and his associate Judge Dawkins in another case,[64] we think they are in as good a position to read the *Erie* signs as are we and until such time as Louisiana's "first writing court", Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 269, declares to the contrary, we accept this for Louisiana in the outcome of this case.

We reject Welders' appeal for contractual indemnity against Coastal.

## XI.

### THROW OUT THE LIFELINE

In the fashion of the day, practically every party turned on every other party with the now familiar refrain—I am not liable but if I am then someone else is more so, and more so to me. Thus Welders sought indemnity under Louisiana and Maritime Law principles from, among others, Olin. It is not clear whether that position is asserted against Olin as an error on this appeal. Coastal sought, and still seeks, indemnity from Aiple Towing, Welders (F&C) and Olin. Not to be outdone, Aiple seeks indemnity from Coastal, Welders, and Olin.

■ As to the claims of Welders and Coastal, and as to Aiple's claim against Olin, the District Court was clearly justified in denying this application of juridical General Average. On the basis of Maritime Law, there being as between these parties no relationship giving rise to a WWLP,[65] *Halcyon*[66] forecloses this effort to obtain contribution. And this is really all that was sought since as we interpret the interpleaders, these amount to claims as between joint tort-feasors. Whatever doubt there may have been is now extinguished by this Court's recent decision in Tri-State Oil Tool, Indus., Inc. v. Delta Marine Drilling Co., 5 Cir., 1969, 410 F.2d 178 recognizing that there is a

---

63. On a like approach to a governmental construction contract this Court has recently chosen for Federal law, the majority rule requiring an unequivocal expression of intent before allowing indemnity for the indemnitee's own negligence. United States v. Seckinger, 5 Cir., 1969, 408 F.2d 146, [Feb. 28, 1969].

64. Mills v. Fidelity & Cas. Co., W.D.La., 1964, 226 F.Supp. 786, aff'd sub nom. Yuba Consolidated Indus. v. Fidelity & Cas. Co., 5 Cir., 1964, 338 F.2d 341. See Arnold v. Stupp Corp., La.Ct.App., 1967, 205 So.2d 797; Buford v. Sewage Bd. of N.O., La.Ct.App., 1937, 175 So. 110; Dubuque Fire & Marine Ins. Co. v.

Union Compress & Warehouse Co., W.D. La., 1956, 146 F.Supp. 482, 485.

65. Warranty of workmanlike performance, see D/S Ove Skou · v. Hebert, 5 Cir., 1966, 365 F.2d 341, 345 n. 6, 1966 A.M.C. 2223.

66. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, 1952 A.M.C. 1. We have commented, Grace Lines, Inc. v. Port Everglades Ter. Co., 5 Cir., 1963, 324 F.2d 699, 701, 1964 A.M.C. 351, 354–355, that some recognized authorities think *Halcyon* has present little vitality now. See Gilmore & Black, Admiralty, at 371 (1957).

maritime right on tort principles for indemnity in a "major-minor", "active-passive" approach, Italia Societa Per Arioni di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732, 1964 A.M.C. 1075. And, although the reference is more oblique, this is also recognized in the recent Supreme Court opinion in Federal Marine Terminals, Inc. v. Burnside Shipping Co., 1969, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371. However, the evidence did not require the Trial Court to lay off all or part of the consequences' in a descending scale from the "most" active down to the "most" passive or the like, since the Trial Court expressly found and we affirm, that Coastal and Welders were both "guilty of active proximate negligence which resulted in Grigsby's death." And to the extent that this is controlled by local, not maritime law, the same is true on the Louisiana principles allowing indemnity to one tort-feasor who is only technically or constructively at fault. Appalachian Corp. v. Brooklyn Cooperage Co., 1922, 151 La. 41, 91 So. 539, 541; Travelers Ins. Co. v. Busy Electrict Co., 5 Cir., 1961, 294 F.2d 139.

██ On the basis of this record, we thus reject the claims of Welders and Coastal seeking indemnity on tort principles. Since Olin has been found free of negligence, Aiple's claim against Olin is denied. As to Aiple's indemnity claims against Coastal, Welders, or both, we remand in Part XII below for determination on the Ryan contractual principles which, if successful, is all the Shipowner

needs. If on such remand[67] the Ryan right fails as to either one or both, then Aiple has the right to undertake establishing indemnity on Delta Marine, supra, tort principles.

## XII.

## THE SHIPOWNER'S RYAN CLAIM

██ But unlike those just discussed which rest on tort principles, one claim of indemnity, that of Aiple against Coastal and Welders, has quite a different status. If, as we have held (see Part III), Grigsby had the vicarious status of seaman because he was doing the seaman's work of life salvage and the barge became unseaworthy because of the operations of Coastal in the performance of its ship maintenance repairing contract with the vessel, her owner or operator, the vessel owner is entitled to indemnity under Ryan for breach of the WWLP.[68] Because of Welders' presence in the chain of contractors, plus supplying services and equipment for the performance of the service contract with it, Aiple may have a Ryan indemnity from Welders as well as Coastal. See Simpson Timber Co. v. Parks, 9 Cir., 1968, 390 F.2d 353, 355, n. 4; Bue, Admiralty Law in the Fifth Circuit—A Compendium for Practitioners: I, 4 Hous.L.Rev. 347, 410, et seq. (1966).

Of course, under Weyerhaeuser[69] some conduct of the Shipowner might preclude indemnity. But on the test so far applied by us, Waterman S.S. Corp. v. David, 5 Cir., 1965, 353 F.2d 660, 1966 A.M.C. 30,[70] and others,[71] there is nothing about

67. See note 72 and related text.

68. Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1956 A.M.C. 9; Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413, 1959 A.M.C. 580; Italia Societa Per Azioni di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732, 1964 A.M.C. 1075; Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., 5 Cir., 1962, 308 F.2d 120, 1963 A.M.C. 1416; United States Lines v. Williams, 5 Cir., 1966, 365 F.2d 332, 1966 A.M.C.

2418; D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 1966 A.M.C. 2223.

69. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, 1958 A.M.C. 501.

70. See also D/S Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 1966 A.M.C. 2223; United States Lines Co. v. Williams, 5 Cir., 1966, 365 F.2d 332, 1966 A.M.C. 2418; Compania Anonima Venezolano de Navegacion v. Matthews, 5 Cir., 1967, 371 F.2d 971, 1967 A.M.C. 1708,

the evidence here to compel a finding of preclusion. Indeed it is difficult to see what the Shipowner did or failed to do that made the ship unseaworthy. The unseaworthiness, found and affirmed here, was due to the manner in which Coastal, the contractor, undertook to do its work knowing that the wing tanks had been long closed and sealed, thus presenting unusual hazards to those making a tank entry. It was Coastal's conduct which had brought the unseaworthiness into play if not into being. Differing only in degree, as to Welders, the District Court found that Welders violated the regulations and that Sonnier's actions contributed toward making the barge unseaworthy.

So far as presently appears nothing done (or undone) by Shipowner interfered with the performance of work by Coastal and Welders or, more important, their unlimited practicable opportunity to eliminate the hazard of tank entry altogether. Although the facts and fact findings now indicate quite strongly a breach of WWLP we do not rule finally on that or the *Weyerhaeuser* preclusion of indemnity since this does not appear to have been considered or passed on by the District Judge. From his opinion, 235 F. Supp. 97 at 109, the Trial Judge assumed this was controlled wholly by Louisiana principles. As the *Ryan* theory is conceptually unrelated to local tort principles mistakenly thought to be the guide, this important matter should be initially appraised, factually and legally, by the Trial Court. On the remand this may be done on the present record with full opportunity to all parties to supplement it as appropriate.[72]

## XIII.

## INADEQUACY OF DOLLAR AWARD TO SURVIVORS

The Trial Court, again feeling that it was just another Court of Louisiana administering an Art. 2315 death claim,[73] allowed $40,000 to the widow for "the loss of love, affection companionship and guidance * * * and for the loss of future support" and to the two minor daughters (age 9 months and 2 years), $50,000 for like elements aggregating $90,000 for all claimants. The survivors appeal urging that we increase the award some $190,000. We decline to fix a larger award but we do agree that the damages fixed are too small.

It was established, without contradiction, that Grigsby's current income was $5,750 per year with good prospects for future advancement. Had 80% of his income been devoted to the support of

---

cert. denied, 389 U.S. 820, 88 S.Ct. 37, 19 L.Ed.2d 71; Watson v. Gulf Stevedore Corp., 5 Cir., 1967, 374 F.2d 946, 1967 A.M.C. 2059, cert. denied, 389 U.S. 927, 88 S.Ct. 286, 19 L.Ed.2d 277; Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Serv., Inc., 5 Cir., 1967, 377 F. 2d 511, 1967 A.M.C. 2593, cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed. 2d 118; Southern Stevedoring & Contracting Co. v. Hellenic Lines, Ltd., 5 Cir., 1968, 388 F.2d 267, 1968 A.M.C. 573.

71. See *e. g.*, Albanese v. N.V. Nederl Amerik Stoomv Maats, 2 Cir., 1965, 346 F.2d 481, 1965 A.M.C. 1201; Mortensen v. A/S Glittre, 2 Cir., 1965, 348 F.2d 383, 1965 A.M.C. 2016.

72. The remand for further proceedings on this issue in Part XII and the *Delta Marine, supra,* issue in Part XI as between Aiple, Coastal and Welders, does not affect the decree in favor of the li-

belants against Welders, Coastal and Aiple, all of which are affirmed as to liability and the absence of contributory negligence and remanded solely for further proceedings on an increase in the dollar amount awarded. As the further hearing is for an *increase*, and in no event a decrease, there appears to be no reason why execution up to the amount heretofore found against each could not be had. In any event, when the new amount is fixed, entry of a final decree as between libelants and all respondents as to the new amount shall not be postponed further by the intramural *Ryan, Delta Marine* controversy. See note 80, *infra.*

73. In concluding each award the Judge stated:
"Considering all the evidence in this case, and the awards granted in recent similar cases [under Article 2315], we fix the awards to * * *." 235 F. Supp. at 105.

his dependents, as was proved to be likely, this element alone, on his life expectancy of over 45 years, discounted at 4%, would have totaled $95,312.18—more than $5,000 greater than the judgment for all elements. On this analysis, the $90,000, as fixed would be exhausted by direct pecuniary loss with no amount for loss to the two children (parental guidance and care),[74] and the loss to all three (Mother and children) of love and affection.[75]

▆▆▆ We think the record compels a finding of not less than $90,000 direct pecuniary loss of support. That is probably on the low side since the computations of present discounted value assume what is so unlikely, that Grigsby's salary would remain constant in this exploding, inflated world. Obviously, some reasonable allowance has to be made for the other two elements. Without even so much as intimating what the awards should be, and certainly not as to awards in other cases and suggestions of libelants (see notes 74 and 75), we think this should be reconsidered by the District Judge on the present record with whatever further supplement is appropriate.

Whatever the conceptual difficulties in applying state death statutes to maritime deaths (see Part V), once liability is established consistent with our reading of Louisiana's reading of its death statute, then the amount to be fixed is to be an independent judgment of an independent Federal District Judge[76] on the record of the case, not what Louisiana Judges have awarded or its appellate courts have sustained.[77]

▆▆▆ We think the careful Trial Judge was influenced considerably by the mistaken notion of his role. He presumably felt constricted by the Louisiana ceiling. We need not therefore cast our ruling in terms of that generally most unfortunate formula—abuse of discretion. A fact finding—and surely damages is a fact[78]—induced by an erroneous legal standard carries no insulation of F.R.Civ. P. 52(a), its judicially ordained maritime counterpart, since absorbed in the new Rules.[79]

The result is that what the Judge thought to be a ceiling at our hands now becomes a floor, requiring remand and increase.[80]

---

74. Libelants urge $1,000 per year per child and cite: Moore-McCormack Lines, Inc. v. Richardson, 2 Cir., 1961, 295 F.2d 583; Rogow v. United States, S.D.N.Y., 1959, 173 F.Supp. 547; Montellier v. United States, E.D.N.Y., 1962, 202 F. Supp. 384, aff'd, 2 Cir., 1963, 315 F.2d 180. Cf. Neal v. Saga Shipping Co., 5 Cir., 1969, 407 F.2d 481; National Airlines, Inc. v. Stiles, 5 Cir., 1959, 268 F. 2d 400, cert. denied, 361 U.S. 885, 80 S. Ct. 157, 4 L.Ed.2d 121.

75. Libelants suggest $20,000 to the widow, $15,000 each to the children, and cite: Stephens v. Natchitoches Parish School Bd., La.Ct.App., 1959, 110 So.2d 156; Shuford v. Employers' Liability Assurance Corp., La.Ct.App., 1962, 141 So.2d 850; Gaspard v. LeMaire, 1963, 245 La. 239, 158 So.2d 149.

76. In Louisiana appellate review extends to fact as well as to law.

77. In the formative days of the Louisiana Direct Action Statute, see Watson v. Employers Liability Assurance Corp., 1954,

348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74; Lumbermen's Mutual Cas. Co. v. Elbert, 1954, 348 U.S. 48, 75 S.Ct. 151, 99 L.Ed. 59, we had to reverse a number of cases in which Trial Judges looked to decided, reported Louisiana Appellate Court decisions as the standard of compensatory damages, e. g., Southern Farm Bureau Cas. Ins. Co. v. Palmer, 5 Cir., 1959, 263 F.2d 206, 209 n. 4; Gillen v. Phoenix Indemnity Co., 5 Cir., 1952, 198 F.2d 147.

78. Neal v. Saga Shipping Co., 5 Cir., 1969, 407 F.2d 481 [Jan. 23, 1969].

79. Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 29 n. 6.

80. See note 72, supra. To give the Trial Judge a free hand initially, the question of interest on the award, its rate, and time of commencement, are also open on remand. See Brown & Root, Inc. v. American Home Assurance Co., 5 Cir., 1963, 321 F.2d 814, 1964 A.M.C. 69; National Airlines, Inc. v. Stiles, 5 Cir., 1959, 268 F.2d 400, cert. denied, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.